894 So.2d 373 (2005)
Bertha SILIEZAR
v.
EAST JEFFERSON GENERAL HOSPITAL and Dr. Joseph Tamimie.
No. 04-CA-939.
Court of Appeal of Louisiana, Fifth Circuit.
January 11, 2005.
*374 Lamar M. Richardson, Mandeville, Louisiana and Romualdo Gonzalez Braden, Gonzalez & Associates, New Orleans, Louisiana, for Plaintiff/Appellant, Bertha Siliezar.
Dwight C. Paulsen, III, C. William Bradley, Jr., Lemle & Kelleher, L.L.P., New Orleans, Louisiana, for Defendant/Appellee, R. Joseph Tamimie, M.D.
Jacqueline G. Griffith, Lydia Habliston Toso, Chehardy, Sherman, Ellis, Breslin, Recile, and Griffith, L.L.P., Metairie, Louisiana, for Defendant/Appellee, East Jefferson General Hospital.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and THOMAS F. DALEY.
THOMAS F. DALEY, Judge.
The plaintiff in this medical malpractice suit has appealed the trial court judgment in favor of the defendants. For the reasons that follow, we affirm.

FACTS:
The plaintiff, Bertha Siliezar, presented to the emergency room at East Jefferson General Hospital on November 25, 1998 with complaints of pain in her right thumb and index finger. The emergency room record indicates the pain had been present over the past couple of weeks and that it was related to her job of handling glassware at a restaurant. The physical examination showed redness and swelling at the interphalangeal joint of the thumb and pain with movement. The index finger was found to be normal. Ms. Siliezar's thumb was placed in a splint and she was instructed to follow up with the defendant, Dr. Joseph Tamimie.
Ms. Siliezar was examined by Dr. Tamimie on December 2, 1998. He noted limited range of motion of her thumb with pain. Dr. Tamimie diagnosed a sprain of the right thumb with stenosing tenosynovitis. He prescribed anti-inflammatory medication and told her to return in one week. He instructed her to continue wearing the splint. When Ms. Siliezar returned to Dr. Tamimie's office on December 9, 1998, Dr. Tamimie noted that Ms. Siliezar was "not any better." He performed surgery on her thumb to release the pulley and remove a fibrous overgrowth in an effort to allow the thumb to move more freely.
Following this surgery, Ms. Siliezar continued to suffer from pain and limited range of motion in her thumb. Dr. Tamimie referred Ms. Siliezar to a hand specialist, Dr. Eric George. Dr. George opined that the cause of Ms. Siliezar's continued pain was scar tissue in the area of the previous surgery and performed a second surgery on Ms. Siliezar in February 1999. Ms. Siliezar was treated by Dr. George for several months following this surgery and was found to have reached maximum medical improvement on June 3, 1999. At this time, Ms. Siliezar was found to have 10% impairment of the hand as a result of the limited motion of her thumb and fingers.
*375 Ms. Siliezar instituted a medical malpractice lawsuit against Dr. Tamimie and the clinic where Dr. Tamimie practices, Occupational Medicine Clinic at East Jefferson General Hospital, (hereinafter referred to as the clinic). The matter proceeded to trial in front of a judge. During the trial, the plaintiff argued that the defendants breached the standard of care by failing to obtain written consent for the surgical procedure and by performing a surgical procedure when more conservative treatment was indicated. At the conclusion of trial, the judge took the matter under advisement. The trial judge then rendered judgment finding the plaintiff failed to sustain her burden of proof that the defendants were liable to her for damages as a result of the surgery performed by Dr. Tamimie.

LAW AND DISCUSSION:
On appeal, plaintiff contends the trial court erred as a matter of law in finding that plaintiff failed to meet her burden of proof in spite of an admission by appellees that they breached hospital policy by failing to obtain written consent before surgery. Plaintiff argues that because the trial court committed an error of law, she is entitled to a de novo review. In the alternative, plaintiff argues that the trial court erred in finding that appellant failed to meet her burden of proof as Dr. Tamimie's version of an alleged verbal consent is inadequate as a matter of law.
At the outset, we reject plaintiff's contention that she is entitled to a de novo review. LSA R.S. 9:2794 sets forth the burden of proof in a medical malpractice action. This statute provides that a plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Thus, by the nature of this statute, whether or not the plaintiff has met his or her burden of proof is a factual finding. Accordingly, appellate review of the trial court's judgment in this case is by the manifest error or abuse of discretion standard. We now turn to the evidence presented in this case to determine whether there was any abuse of discretion or manifest error in finding the plaintiff failed to sustain her burden of proof.
Ms. Siliezar testified that she came to the United States in 1983 at the age of 29. Her native language is Spanish, but she does speak English. She is a U.S. citizen. Ms. Siliezar testified that part of her job duties are delivering food to tables and picking up dirty dishes. In November of 1998 she developed what she described as a bruise on her right hand by her thumb. She visited the emergency room and was told to wear a splint, take anti-inflammatory medication, and follow up with Dr. Tamimie. She testified that she was able to *376 move her thumb when she visited the emergency room.
Ms. Siliezar testified that she was examined by Dr. Tamimie on December 2, 1998. She could still move her thumb, but it was painful. She explained that Dr. Tamimie told her to continue the splint and take oral medication. If that was not successful, she would need a shot in the area. If the shot was not successful, she would then need surgery. Ms. Siliezar testified that she told Dr. Tamimie she did not want an operation on her hand. She testified that she took the medication and wore the splint as much as she could. She had to remove the splint at work.
Ms. Siliezar testified that when she returned to Dr. Tamimie on December 9, 1998, she told him that her hand felt the same. She thought that she was going to have a cortisone shot in her thumb. Ms. Siliezar testified that she was brought into another room and waited a long time. When Dr. Tamimie came into the room, she turned her head because she did not want to watch him administer the shot. Ms. Siliezar testified that she then turned back to look at the hand and saw blood. He had cut her hand. She denied that Dr. Tamimie or anyone in the clinic told her she was going to have surgery on her hand and further denied that she consented to the surgery.
Ms. Siliezar further testified that following the surgery her hand was swollen and painful. She was told that she had to attend physical therapy and it was a month later before Dr. Tamimie's office set up her physical therapy. Ms. Sililezar testified that she always put forth maximum effort both at physical therapy and when she was told to move and exercise her hand.
Ms. Siliezar testified that she did not refuse to have a cortisone shot on the December 9, 1998 visit, as Dr. Tamimie contends. Rather, Ms. Siliezar testified that a cortisone injection was not offered at this visit. Although Ms. Siliezar denied any previous history of cortisone injections, medical records introduced into evidence show that she received cortisone injections in her left hand at another clinic in 1995.
Dr. Tamimie testified that when he examined plaintiff on December 2, 1998, she reported a history of pain and locking in her right thumb for one month. He noted that her right thumb was locked at the interphalangeal joint. Dr. Tamimie testified that he diagnosed stenosing tenosynovitis, stage 6, which is the most advanced stage. Dr. Tamimie testified that he told plaintiff that the treatment options were splinting and anti-inflammatory medication, cortisone injections, and then surgery. He testified that he told plaintiff he would give her one week to see if splinting and a strong anti-inflammatory medication would improve her condition. Dr. Tamimie testified that when Ms. Siliezar returned on December 9, 1998, her condition was not improved. The thumb was still locked. Dr. Tamimie testified that he would have preferred to administer a cortisone injection on this date, but Ms. Siliezar refused.
Dr. Tamimie testified that he had no difficulty communicating with Ms. Siliezar in English. In fact, he stated that she filled out his intake form in English. Dr. Tamimie testified that he knows limited Spanish and may have used a couple of Spanish words in communicating with Ms. Siliezar. Dr. Tamimie further testified that there was an employee in the clinic who spoke Spanish who could have been used as an interpreter if necessary.
Dr. Tamimie testified that on December 9, 1998, after plaintiff refused the cortisone injection, he explained the surgical *377 procedure, as well as the risks of the procedure. Dr. Tamimie testified that after he explained the procedure and its risks, he left a written consent for Ms. Siliezar to sign. He explained that while it is the policy of the clinic to obtain a written consent prior to performing surgery on a patient, Ms. Siliezar did not sign the consent form. Dr. Tamimie testified that he did not know why the form was not signed, but that Ms. Siliezar did not refuse to sign the form. He had no explanation for why the form was not signed. He testified that he expects the nurse to verify that the written consent form is signed. Dr. Tamimie testified that while it is common procedure in the clinic to obtain written consent to surgery, this is not always done.
Dr. Tamimie testified that he ordered physical therapy for plaintiff on December 18, 1998, but Ms. Siliezar did not begin physical therapy until January 8, 1999 because his office had difficulty getting approval for physical therapy from plaintiff's worker's compensation insurer.
Dr. Tamimie testified that he treated Ms. Siliezar until January 27, 1999 when he referred her to Dr. Eric George, a hand specialist, for continued complaints of pain in her hand. Dr. Tamimie testified that the cause of Ms. Siliezar's hand pain and limited mobility was her refusal to move the thumb and perform exercises with her hand.
Kristie Wargo testified that she was employed as a nurse in the clinic at the time of plaintiff's surgery. She testified that she spoke to plaintiff in English and that plaintiff understood English. Nurse Wargo testified that she put plaintiff in the operative room and prepared her for surgery. Although she was not in the room when Dr. Tamimie discussed the surgical procedure with plaintiff, she was in the next room and was able to hear Dr. Tamimie explain the procedure to plaintiff. Nurse Wargo testified that it was the normal procedure in the clinic for Dr. Tamimie to leave the consent with the patient to review then sign. She had no explanation for why the consent was not signed in this case.
Nurse Wargo further testified that prior to the surgery she placed plaintiff's arm in an arm board and set out all of the operative instruments. Dr. Tamimie came in and cleaned the arm while she placed a cuff on the arm to decrease bleeding. Nurse Wargo testified that at no time did Ms. Siliezar state that she did not want surgery nor did she ask Dr. Tamimie to stop the procedure. Nurse Wargo testified that as Dr. Tamimie performed the surgery, he told plaintiff what he was doing and asked several times if plaintiff was o.k. Nurse Wargo testified that following surgery, she stressed the importance of exercising the thumb to plaintiff.
Dr. George was accepted by the court as an expert in orthopedic surgery specializing in surgery of the hand. Dr. George testified that he did not have difficulty communicating with plaintiff in English. He testified that plaintiff told him that her thumb was locked when she presented to Dr. Tamimie. When he examined Ms. Siliezar in February 1999, he diagnosed tendon adhesions, scar entrapment, and reflex sympathetic dystrophy. On February 9, 1999, Dr. George performed surgery on Ms. Siliezar's right hand in an effort to release the nerve that was trapped in a scar. Dr. George opined that the cause of the scar tissue that entrapped the nerve was from non-use of the thumb following the initial surgery. Nine days following the second surgery, Dr. George ordered physical therapy. Although Ms. Siliezar completed the physical therapy program, Dr. George testified that the notes from therapy state that plaintiff was not using her thumb unless she was forced to in *378 therapy and was not performing exercises at home as instructed. Dr. George further testified that when he examined plaintiff to assign her a disability rating, she did not put forth maximum effort. Dr. George explained that he was able to tell that Ms, Siliezar had symptom magnification because the results of the maximum grip strength, in which the patient has to grip and hold, should always be greater than rapid fire grip, in which the patient grips several times in rapid succession. Ms. Siliezar's rapid fire grip was much higher than her maximum grip. Dr. George testified that he explained to Ms. Siliezar on several occasions the importance of moving her thumb and performing her home exercise program. Dr. George explained that Ms. Siliezar developed reflex sympathetic dystrophy, a condition in which there is limited motion of the hand that leads to increased pain and decreased motion. He discharged her to return to full duty work on June 24, 1999.
Dr. George testified that he was trained to obtain written consent prior to performing surgery but he was unable to state whether the failure to do so is a breach of the standard of care. He further testified that if a clinic has a policy to obtain written consent prior to surgery and written consent is not obtained, this is breach of the standard of care.
Dr. George performed an independent medical examination on plaintiff on February 4, 2000 and determined that she had a 9% impairment of the hand, 8% impairment of the upper extremity, and a 5% impairment of the whole person.
Raoul Diaz, M.D. was accepted by the court as an expert in orthopedic surgery. Dr. Diaz, who testified on behalf of plaintiff, treated plaintiff from October 1999 until May 2002. He testified that he always communicated to Ms. Siliezar in Spanish because she communicated and understood best in Spanish. Dr. Diaz opined that it was a breach of the standard of care for Dr. Tamimie to perform surgery on Ms. Siliezar's thumb if the thumb was not locked. He testified that it was a breach of the standard of care for Dr. Tamimie to perform the surgery without having tried cortisone injections. Dr. Diaz stated that he would have treated plaintiff's condition with steroid injections and that this condition rarely requires surgery. Dr. Diaz further testified that the standard of care requires a written consent to be signed prior to performing a surgical procedure. On cross-examination, Dr. Diaz admitted to being a personal friend of plaintiff's attorney.
Ralph Gessner, M.D. was accepted by the court as an expert in orthopedic surgery. Dr. Gessner testified that he served on the medical review panel in this matter. He stated that the panel rendered an opinion finding that there was no breach of the standard of care by the defendants. However, Dr. Gessner explained that at the time of the panel hearing, he was unaware that Ms. Siliezar did not sign a written consent to the surgical procedure. Dr. Gessner testified that had he known there was no written consent, he would have found Dr. Tamimie breached the standard of care.
LSA R.S. 40:1299.40 sets forth the requirements for obtaining informed consent from a patient. This statute states in pertinent part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function *379 of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

. . .
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
Thus, the statute does not require that a patient's consent be written, and it may indeed be verbal, assuming it meets the established criteria. La. R.S. 40:1299.40(C); Capel v. Langford, XXXX-XXXX (La.App. 3 Cir. 4/28/99), 734 So.2d 835. Accordingly, we reject plaintiff's contention that the defendants' failure to obtain written consent is malpractice per se.
Dr. Tamimie testified extensively regarding the conversation he had with Ms. Siliezar prior to the December 9th surgery. Dr. Tamimie testified that he explained the procedure to plaintiff as surgery to free the locked tendon at the base of the right thumb to let the thumb move easily. Dr. Tamimie testified that he went over the risks of bleeding, infection, scarring, locking, and pain with scarring, and numbness. He further testified that he explained the alternatives were splinting with medication and injection with cortisone. Dr. Tamimie testified that because Ms. Siliezar refused a cortisone injection and the splinting and anti-inflammatory medication did not improve her condition, the only option was surgery.
Nurse Wargo testified that she heard Dr. Tamimie explain the procedure to plaintiff. She further testified that Dr. Tamimie explained what he was doing during the time he performed the surgery. Both Dr. Tamimie and Nurse Wargo testified that Ms. Siliezar did nothing to indicate that she did not consent to the surgery.
We have reviewed the testimony of plaintiff in which she testified that she was never given a chance to consent to the surgery because she was not told that surgery would be performed. The trial judge obviously did not find her testimony to be credible.
In Rosell v. ESCO, 549 So.2d 840, (La.1989), the Court stated:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and *380 inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous  clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest error  clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Dr. Tamimie testified that plaintiff consented to the procedure while plaintiff denied that she consented to the procedure. Given the standard of appellate review set forth above, we cannot say that the trial court was clearly wrong or manifestly erroneous in finding that plaintiff failed to sustain her burden of proof that there was a breach of the standard of care.
Plaintiff strenuously argues that defendants' failure to obtain written consent is negligence per se and, therefore, the defendants committed malpractice in failing to obtain written consent. We disagree. While we acknowledge that the clinic had a written policy stating that written consent must be obtained prior to surgery, R.S. 40:1299.40 C provides that verbal consent is sufficient if it includes the information set forth in 40:1299.40 A(1) and the patient is given an opportunity to ask questions and those questions are answered. Thus, we find that defendants did not commit malpractice by failing to obtain written consent prior to the surgery.
We find that the consent obtained by Dr. Tamimie was sufficient under R.S. 40:1299.40 C based on the testimony of Dr. Tamimie and Nurse Wargo. Dr. Tamimie testified extensively as to the conversation he had with plaintiff prior to performing the surgery. Dr. Tamimie testified that he told plaintiff that the alternative treatments were to continue splinting with anti-inflammatory medication and cortisone injection. Dr. Tamimie testified that he explained the surgical procedure as being performed to release the locked tendon at the base of the right thumb to allow the thumb to move freely. He testified that he explained to plaintiff that the risks of the surgery included bleeding, infection, scarring, locking, and pain with scarring and numbness. Dr. Tamimie further testified that he answered plaintiff's questions and that plaintiff was given an opportunity to think about the procedure before she *381 was taken into the surgery room. The testimony of Nurse Wargo corroborated that of Dr. Tamimie. Both Dr. Tamimie and Nurse Wargo testified that plaintiff did nothing to indicate that she did not consent to the surgery. We assume the trial court found the testimony of Dr. Tamimie and Nurse Wargo to be credible. Thus, we find there is sufficient evidence in the record to support the trial court's finding that the plaintiff failed to carry her burden of proof[1].
The record was void of any testimony that any nurse or other non-physician employee of the clinic/hospital breached the standard of care. Thus, the trial judge correctly found that plaintiff did not meet her burden of proof with regard to any alleged malpractice on the part of the clinic/hospital.
At the conclusion of trial, the parties submitted post-trial briefs. The brief submitted by plaintiff made several allegations regarding the testimony of Dr. Tamimie and Nurse Wargo's. Plaintiff's brief stated that the testimony of these witnesses were rehearsed and concocted after it became apparent that the surgery was unsuccessful. In response to this brief, the defendants filed a Motion to Strike portions of plaintiff's post-trial brief. On appeal, plaintiff contends the trial court erred in granting the Motion to Strike and asks this Court to set aside that judgment.
The judgment on the Motion to Strike ordered plaintiff's attorney to file an amended brief removing "any suggestion that the witness for defense were coached, rehearsed, or in some manner testified based upon some scheme or conspired plan of conduct." The judgment further stated that the court found plaintiff's brief violated Rule 7 of the Louisiana Code of Professionalism. Plaintiff's counsel urges this Court to set aside this judgment and any implication of unprofessional conduct on the part of counsel.
Rule 7 of the Code of Professionalism[2] states:
I will not engage in personal attacks on other counsel of the court. I will support my profession's efforts to enforce its disciplinary rules and will not make unfounded allegations of unethical conduct about other counsel.
Plaintiff's original post-trial brief states that the attorneys for the defendant coached and rehearsed the testimony of Dr. Tamimie and Nurse Wargo during at least five pre-trial meetings "in addition to their sessions together to get their stories straight" and that the defense had "concocted a rather amazing mosaic of defenses." In his Reasons for Judgment, the trial judge concluded there was no evidence in the record to support the repeated allegations of coaching, concocting, rehearsing made in plaintiff's post-trial brief. The trial court made its findings after a full hearing on defendant's Motion to Strike in which both parties presented their positions. We find that the trial judge was in the best position to evaluate the professionalism of counsel's conduct. Thus, we find no error in the trial court's judgment finding plaintiff's attorney violated Rule 7 of the Code of Professionalism.
*382 For the foregoing reasons, the judgment appealed is affirmed.
AFFIRMED.
NOTES
[1] This Court's opinion is limited to the issue of consent because plaintiff's Assignments of Error on appeal regarding liability relate solely to the issue of consent.
[2] The Louisiana Code of Professionalism was incorporated into the Louisiana District Court Rules, Rule 6.2.