907 So.2d 250 (2005)
Sonja JACKSON, Plaintiff-Appellant
v.
STATE of Louisiana, et al., Defendants-Appellees.
No. 39,759-CA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*252 Anthony J. Bruscato, for Appellant, Sonja Jackson.
Hudson, Potts & Bernstein, for Appellees by Brady D. King, II, Monroe, E.A. Conway Medical Center and State of Louisiana, Health Care Authority.
Before WILLIAMS, STEWART and DREW, JJ.
STEWART, J.
Sonja Jackson sued the State of Louisiana and E.A. Conway Medical Center (herein referred to jointly as "Conway") for damages after surgery to remove fibroid tumors from her uterus and to open her fallopian tubes resulted in the removal of her uterus, fallopian tubes, and ovaries. She alleged lack of informed consent for the surgery and medical malpractice as grounds for recovery. The trial court ruled in favor of the defendants, and Ms. Jackson now appeals. Being constrained by the manifest error standard of review, we find no error in the trial court's denial of her medical malpractice claim. However, we find that the failure to inform Ms. Jackson that removal of her ovaries would result in menopause precluded informed consent. For this reason, we reverse the trial court's denial of the informed consent claim and award $25,000 in general damages.

FACTS
Conway's records indicate that since 1982, Ms. Jackson had sought treatment for complaints of dysmenorrhea (painful menstruation), menorrhagia (heavy bleeding), and abdominal pain. She had been diagnosed with pelvic inflammatory disease. In 1992, she sought treatment for infertility as she had been unable to become pregnant by her partner. It was determined that she suffered from bilateral tubal obstruction and uterine fibroid tumors. On September 22, 1992, Conway referred her to Louisiana State University Medical Center  Shreveport ("LSUMC") which had a clinic specializing in fertility problems. Ms. Jackson contacted LSUMC the next day and was evaluated at the clinic on December 18, 1992. Because lack of transportation prevented her from getting to Shreveport from her home near Monroe, Ms. Jackson had to reschedule a number of appointments at LSUMC.
By May 1994, the physicians at LSUMC had determined that Ms. Jackson was a candidate for a myomectomy (surgical removal of the fibroid tumor) and a neosalpingostomy (surgical procedure to open *253 the fallopian tubes). She was also to be evaluated for therapy with Lupron, a drug that induces a menopause-like state so as to deprive estrogen-dependent tissue, such as uterine fibroids and the uterus, of estrogen in order to attempt to shrink the tumor in preparation for surgery. A progress note dated May 13, 1994, relates the opinion of "Dr. Berry" that Ms. Jackson was only a candidate for a myomectomy in preparation for "IVF" (in vitro fertilization), and that if she did not desire IVF, then she would need a "TAH" (total abdominal hysterectomy). However, there was no indication in LSUMC's records that either IVF or TAH had been discussed with her. On June 15, 1994, Ms. Jackson had her first Lupron injection at LSUMC. Due to lack of transportation, she was unable to return to LSUMC for further treatment. A letter dated November 29, 1994, written by Donna Long, a nurse at LSUMC, advised Ms. Jackson as follows:
I received your letter. Since you do not have transportation to come to LSU Medical Center in Shreveport, I think it is very important that you go to E.A. Conway Hospital in Monroe to be checked. Go to the Emergency Room any time at E.A. Conway and ask to see a GYN doctor. Tell the doctor to call me if he has any questions. Please go as soon as possible.
Ms. Jackson returned to Conway on December 7, 1994, complaining of heavy menses and a history of fibroid tumors. The screening record notes that she had been referred to LSUMC and that she had a fibroid the size of a 16-week uterus as of June 1994. She was scheduled for an appointment on December 13, 1994, at Conway's Ob/Gyn Clinic. Progress notes state that Ms. Jackson was then 34 years of age, that she had a long-standing history of fibroids, and that she desired fertility. The record of the follow-up appointment notes that she had received one Lupron injection, that she wanted to remove the fibroid tumors, and that she could not get to Shreveport for treatment. A note set forth a treatment plan for Lupron injections for the next three to six months then referral to LSUMC for myomectomy and neosalpingostomy. However, the note was marked over, and another notation was written stating, "Why not do her now, here!"
Ms. Jackson was admitted to Conway on December 27, 1994, for surgery. Included in the record is a consent form for surgery signed by Ms. Jackson on December 27, 1994, at 8:30 p.m. Although the copies in the record consist of two pages, the actual form was one page with the procedure and risks written on the front and the signatures on the back. The front of the form authorizes "EACH Staff" to perform a myomectomy, chromopertubation (injection of dye into fallopian tubes to learn if open), neosalpingostomy (opening of fallopian tube), and "if indicated Transabdominal Hysterectomy and/or salpingo-oophorectomy" (removal of the fallopian tubes and ovaries).[1] In general terms, the nature and purpose of the surgery was described as removal of "the fibroids from... uterus and to attempt to clear my tubes  If indicated will remove my uterus, tubes, and/or ovaries." The phrase "if indicated" was not explained on the form. Risks were listed as bleeding requiring transfusion, infection, infertility, and ectopic pregnancy. Oddly, the front of the form had Dr. Kleinpeter's name as the physician who apprised Ms. Jackson of the above stated information, but the physician who signed the form certifying that it was filled out and explained to the patient prior to *254 signature was Dr. Johnny Swiger, who also performed the surgery. A pre-op note from December 27, 1994, claimed to have been written by Dr. Swiger, states generally that the planned procedure, risks, and benefits had been explained; that the patient agreed and voiced understanding of possible complications; and that the consent had been signed and witnessed.
Surgery was performed on December 29, 1997, by Dr. Swiger, who was a resident at the time, and by Dr. John Ziegler, an ob/gyn specialist on staff at Conway. The operative report describes the surgery as "Attempted myomectomy, unsuccessful, and chromopertubation revealing fallopian tube blockage bilaterally with resultant total abdominal hysterectomy and bilateral salpingo-oophorectomy."[2] Complications were noted to be multiple intra-abdominal adhesions. The operative report explains the reasons for the decision to remove Ms. Jackson's uterus, fallopian tubes, and ovaries as follows:
Due to the blockage of the tubes and the overt submucosal location of the fibroids and the fact that there was no viable uterine remnant left after the removal of the fundal fibroid it was decided upon at this time that the best course of action for the patient's future and medical well being was that of a total abdominal hysterectomy and bilateral salpingo-oophorectomy.
The pathology report following surgery notes that the fibroid removed during surgery weighed 700 grams and measured 20 × 15 × 12 centimeters. Dr. Swiger's operative note described the fibroid as a 16-week uterus, described the fallopian tubes as clubbed, and noted that there were multiple adhesions to the ovaries, uterus, and tubes.
Ms. Jackson was discharged from Conway on January 3, 1995. She was re-admitted on January 13, 1995, with complaints of heavy bleeding. Progress chart notes indicate that Ms. Jackson reported that she had "fibroids taken out" and that she had not had a hysterectomy. An addendum to the progress note apparently written after checking with Dr. Ziegler and reviewing Ms. Jackson's records confirmed that she did have a TAH/BSO. However, there is no indication that this was explained to Ms. Jackson. Notes from a follow-up visit to Conway on February 21, 1995 state, "[Patient] is unaware that she had a hysterectomy; the procedure she had done was thoroughly explained to her today."
In her suit against Conway, Ms. Jackson alleged that the hysterectomy was done without her consent and in contravention of her desire for fertility. She also alleged that removal of her uterus, ovaries, and fallopian tubes was unnecessary in the absence of any medical emergency and deprived her of future hormonal function. Finally, Ms. Jackson alleged that Conway's health care providers failed to advise her that a hysterectomy had been performed and allowed her to continue to believe that only fibroids had been removed until almost two months following the surgery.
In answer, Conway asserted that the hysterectomy was medically necessary and neither caused nor increased Ms. Jackson's inability to have children inasmuch as she could not have done so as a result of her condition even prior to the surgery. Also, Conway asserted that even if the physicians failed to disclose that a TAH/BSO might be done, the patient would have consented to the treatment had the material risks been disclosed.
*255 Following a bench trial, the trial court rendered a judgment on November 15, 2004, in favor of Conway dismissing all of Ms. Jackson's claims with prejudice. In denying the informed consent claim, the trial court found that Ms. Jackson had been fully informed of the surgery as documented by an executed consent form and the medical records showing that she was advised of the anticipated procedures and that she was unequivocally put on notice that removal of her uterus, tubes, and ovaries would be done as alternative procedures if necessary. In denying the medical malpractice claim, the trial court noted that the 700 gram fibroid tumor was over four times the size of the uterus and had "completely perforated the uterine cavity." The court noted that the surgeons removed the uterus because it was unviable and leaving it in would have subjected Ms. Jackson to unwanted complications including bleeding, infection, cancer, and subsequent surgery. The court also noted that the surgeons found severe pelvic adhesions involving the tubes and ovaries, which were removed to avoid similar unwanted complications. Because much of the trial addressed Conway's failure to follow the treatment plan for a course of Lupron injections before proceeding to surgery, the trial court addressed that issue and found that Ms. Jackson failed to establish the standard of care for use of Lupron. Additionally, the trial court concluded that Ms. Jackson sustained no damages as she was never going to be able to conceive naturally due to the condition of her ovaries and uterus and would probably never be able to carry a child to term if IVF were utilized.
Ms. Jackson's appeal followed.

DISCUSSION

Medical Malpractice
In a medical malpractice action, the plaintiff must prove the applicable standard of care, the breach of the standard of care, and the causal connection between the breach and resulting injuries. Lugenbuhl v. Dowling, XXXX-XXXX (La.10/10/97), 701 So.2d 447. When the plaintiff alleges acts of medical negligence that raise issues peculiar to a particular medical specialty, the standard of care is the degree of care ordinarily practiced by physicians within the involved medical specialty. La. R.S. 9:2794(A)(1). Except in cases of an act of obvious carelessness from which a lay person can infer negligence, expert witnesses who are members of the medical profession are necessary to determine whether the defendant possessed the requisite degree of skill or knowledge or failed to exercise reasonable care and diligence. Demopulos v. Jackson, 33,560 (La.App. 2d Cir.6/21/2000), 765 So.2d 480; Pugh v. Beach, 31,361 (La.App. 2d Cir.12/11/98), 722 So.2d 442. When there are conflicting expert opinions concerning the defendant's compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Pinnick v. Louisiana State University Medical Center, 30,263 (La.App. 2d Cir.2/25/98), 707 So.2d 1050.
Ms. Jackson argues that the trial court erred in finding that she sustained no damages and in failing to address whether the standard of care was breached by removal of her uterus and ovaries. She suggests that the trial court's failure to assess whether she lost a chance of conception was an error of law requiring de novo review of the record. We disagree. The trial court clearly considered whether Ms. Jackson lost the chance of conception when it determined from the evidence that Ms. Jackson was never going to conceive naturally and that she would have "probably never" carried a child to full term if IVF were done. We do not find that use *256 of the phrase "probably never" in the reasons for judgment indicates that the trial court applied the wrong legal standard in finding that Ms. Jackson sustained no damages or requires this court to conduct a de novo review. Our review of this matter is guided by the manifest error standard as explained in Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Moreover, appeals are taken from the judgments, not reasons for judgments. Greater New Orleans Expressway Com'n v. Olivier, 2002-2795 (La.11/18/03), 860 So.2d 22; Hickman v. Bates, 39,178 (La. App. 2d Cir.12/15/04), 889 So.2d 1249.
This matter presents two allegations of malpractice  the failure of the physicians at Conway to follow the treatment plan calling for Lupron injections prior to surgery and the removal of Ms. Jackson's uterus and ovaries absent medical necessity and contrary to her desire for fertility. These issues require expert testimony to determine negligence.
The only treating physician who testified was Dr. John Ziegler, who was on staff at Conway as a teacher in 1994, and assisted in Ms. Jackson's surgery. However, Dr. Ziegler did not have any personal recall of treating Ms. Jackson. Regarding the decision to proceed to surgery without first treating Ms. Jackson with Lupron to attempt to shrink the fibroids, Dr. Ziegler testified that there is a difference of opinion as to its use prior to surgery. He explained that Lupron does not clear the fibroids or make the surgery go any better, that it does not work in every instance, and that the effects are variable when it does work. Also, he believed that Lupron had not been FDA approved for pretreatment of fibroids in 1994. Dr. Ziegler did not recall any discussion regarding a change in Ms. Jackson's treatment plan. But noting the difficulties she had getting to her appointments in Shreveport, he believed that she needed a practical plan of care to fit her situation.
Dr. Ziegler explained that the intended surgery was to remove the fibroids and to open the fallopian tubes. They did not intend to perform a TAH/BSO. However, once the 700 gram fibroid was removed, there was not anything left from which to reconstruct a viable uterus. Dr. Ziegler testified that if the uterus had remained it "very likely" would have resulted in future problems. He also explained that both the ovaries and fallopian tubes were no longer normal as they had become encased by adhesions and scar tissue due to infection that had been going on for some time as evidenced by Ms. Jackson's history of frequent visits to Conway's emergency room. He stated that leaving the ovaries would have resulted in future flare-ups of infection, the possibility of hernia formation, and a high likelihood of another surgery. Dr. Ziegler believed that "it would have been below the standard of care to have left such as mess as that" in Ms. Jackson.
Dr. Rodney Wise, the director of Conway's ob/gyn department, testified as an expert but was not involved in Ms. Jackson's treatment. Dr. Wise noted that Conway had found that Ms. Jackson suffered from uterine fibroids and blocked tubes before referring her to LSUMC's fertility clinic. He testified that even with her problems, there was some chance that she might be able to conceive, but he also testified that her chance of natural conception in 1992 was essentially zero. He attributed the cause of her infertility to the fibroid distorting her uterus and blocking the fallopian tubes, the damaged fallopian tubes, and the adhesions and scar tissue around her ovaries and fallopian tubes caused by past infectious process from pelvic inflammatory disease. He noted that at the time of her referral to LSUMC in 1992, the fibroid was quite small, but by *257 1994, it had become quite large, obliterating the entire frontal portion of the uterus and distorting the entire organ. He also noted that her medical history showed that she had been having significant symptoms from the fibroid and adhesions including pelvic pain and heavy menses.
Dr. Wise explained that Lupron was not a fertility treatment for Ms. Jackson. It was his opinion that the standard of care in 1994 did not require treatment with Lupron to shrink fibroids prior to surgery. He stated that there was no consensus on its use and that the decision to use or not use Lupron was a medical judgment. He noted that shrinkage is variable when Lupron is used and that the drug may also shrink the uterus.
Dr. Wise had no criticism of the decision to remove the uterus, calling it a medical judgment of whether there was enough organ tissue remaining to reconstruct something near a normal organ. He explained the risks of leaving the uterus as possible interruption of the vascular supply that might cause loss of tissue, post-operative bleeding requiring additional surgery, and formation of more scar tissue that might affect adjacent organs. He believed that Ms. Jackson's chance of conception would have been essentially zero if the uterine remnant had remained and that there would have been a higher risk for uterine rupture during a pregnancy due to the reconstructed uterus being unable to stretch enough to accommodate a pregnancy.
Dr. Wise believed that the decision to remove the ovaries was also a medical judgment call. He explained that the ovaries no longer had a normal anatomical position due to being adhered to the pelvic sidewall and encased in scar tissue. Leaving them in place would have likely caused the formation of more scar tissue further encasing the ovaries and other organs and leading to a very high likelihood of consistent chronic pain. Dr. Wise also noted that ovarian cancer is a significant risk to women. Dr. Wise explained that the only benefit to leaving the ovaries in from a fertility standpoint would have been to serve as an egg donor for IVF. He believed that even with a reconstructed uterus, Ms. Jackson's chances of successful implantation and pregnancy were "extremely low end" and "essentially nil." He also believed that if IVF ever took place, then Ms. Jackson would also need a surrogate carrier. He concluded that the decision to remove the ovaries was a proper medical judgment.
Ms. Jackson's expert was Dr. Marcia C. Bowling, a gynecologic surgeon whose deposition was admitted into evidence in lieu of testimony. Dr. Bowling criticized the failure of the physicians at Conway to follow the plan for Lupron treatment prior to surgery. She believed that Lupron would have been beneficial to the effort to preserve Ms. Jackson's fertility as it may have improved the likelihood of keeping her uterus intact. She explained that removal of a smaller fibroid lessens the risks of trauma to the uterus, bleeding, and having to perform a hysterectomy. It was Dr. Bowling's opinion that there is no need to remove the uterus of a fertility patient absent a nearly life-threatening situation. She criticized the failure of Conway's physicians to reconstruct a uterus from the uterine remnant left after removal of the fibroid. She believed there was a breach of the standard of care, because the operation was for infertility, and a hysterectomy was not what Ms. Jackson expected. It was Dr. Bowling's opinion that it would have been appropriate to "bend over backwards" to preserve the uterus and allow Ms. Jackson to make a decision regarding pregnancy in light of the risk of uterine rupture. Dr. Bowling also believed that *258 removal of the ovaries was a breach of the standard of care. She concluded that the ovaries were normal and that leaving them intact would be important for hormone production in a woman 34 years of age.
The evidence also included the affidavit of Dr. Johnny Swiger, a third-year resident at the time of the surgery who operated on Ms. Jackson with Dr. Ziegler's assistance. According to the affidavit, Dr. Swiger had some recollection of Ms. Jackson's treatment. He also reviewed Conway's records. Dr. Swiger's affidavit recounts the surgery as described in the post-operative report. The affidavit states that the TAH/BSO was medically necessary and that all efforts were made to save the uterus and ovaries. It was his opinion that even if the uterus and ovaries had not been removed, Ms. Jackson still would not have been able to conceive.
Lastly, Donna Carpenter Long, a nurse involved in Ms. Jackson's treatment at LSUMC, testified. Ms. Long wrote the November 29, 1994, letter to Ms. Jackson advising her to return to Conway for treatment. Ms. Long did not recall Ms. Jackson. However, from her review of the letter and the records from LSUMC, she testified that there was nothing in the letter to indicate that she referred Ms. Jackson to Conway to continue Lupron therapy. She believed that Ms. Jackson may have complained of problems, so she urged her to get checked at Conway.
We can find no manifest error in the trial court's denial of Ms. Jacksons' medical malpractice claim. The experts gave differing opinions as to whether the standard of care for performing surgery to remove fibroids in a fertility patient was breached by the removal of the uterus and ovaries or by the failure to treat Ms. Jackson with Lupron prior to surgery. Where the experts' opinions are in conflict, we are obliged to give deference to the trier of fact's decision. Pinnick, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra. As determined by the trial court, Ms. Jackson failed to establish that the standard of care required treatment with Lupron injections prior to surgery to remove fibroid tumors even in a patient seeking fertility. The record establishes that the decision of whether to use Lupron was a medical judgment call. So too was the decision whether to remove the uterus and ovaries during the surgery. The record provides ample support for finding that decisions made and actions taken by Drs. Ziegler and Swiger during surgery were not malpractice. It shows that their intent was to remove the fibroid tumors and to open the fallopian tubes, but the anatomical situation discovered as a result of surgery prompted them in the exercise of their medical judgment to proceed with removal of the uterus, fallopian tubes, and ovaries for the well-being of the patient. We cannot say that this record establishes a breach the standard of care even though Ms. Jackson underwent surgery in the hope of achieving fertility.
Moreover, the evidence shows that Ms. Jackson had no chance of conceiving absent some surgical intervention and possible utilization of IVF. As stated previously, the record does not show that Ms. Jackson desired IVF, that she was ever apprised of that option, or that she would be a realistic candidate for the procedure. Thus, the record does not establish that the surgery was the cause of Ms. Jackson's infertility or deprived her any real chance of pregnancy. For these reasons, we affirm the trial court's denial of Ms. Jackson's medical malpractice claim.

Informed Consent
*259 The methods of obtaining informed consent are set forth in La. R.S. 40:1299.40, in relevant part, as follows:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed.... Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
* * *
C. Where consent to medical treatment from a patient... is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
In a lack of informed consent case, the plaintiff must prove not only that the physician failed to disclose all material information, but also that there was a causal connection between the failure to disclose and the claimed damages. Lugenbuhl, supra; LaCaze v. Collier, 434 So.2d 1039 (La.1983). To establish causation, the plaintiff must prove that the defendant's breach was a cause-in-fact of the claimed damages and that a reasonable person in the plaintiff's position would not have consented to the treatment or procedure if the material information and risks had been disclosed. Lugenbuhl, supra at 454. Some expert testimony is needed to establish the existence and nature of a material risk and the likelihood of its occurrence. Hondroulis v. Schuhmacher, 553 So.2d 398, 412 (La.1988). The issue is "whether a reasonable person in the patient's position probably would attach significance to the specific risk." Id.
In reviewing Ms. Jackson's informed consent claim, we are mindful of the supreme court's recent informed consent decision in Thibodeaux v. Jurgelsky, 2004-2004 (La.3/11/05), 898 So.2d 299, rehearing denied. That opinion forcefully reminds us that we must not substitute our own factual finding for that of the trial court and that the evidence must be viewed in the light most favorable to the party who prevailed before the trier of fact. See also Lugenbuhl, supra.
Claiming that she signed a blank consent form that was later filled in by the physicians, Ms. Jackson asserts that she did not give informed consent for removal of her uterus and ovaries. Ms. Jackson, who had been a patient at Conway over the years, testified at trial that Conway had patients sign a blank consent form at admission. Cross-examination of Ms. Jackson revealed that at her deposition she initially denied ever seeing the form, but then she admitted that the signature was hers and claimed that one side was blank when she signed. She then claimed that it was handed to her so that one page covered the other; however, the original *260 form signed by her was only one page printed on both sides.
The record includes a fully executed consent form signed by Ms. Jackson. The signed form is presumed valid and effective absent proof that its execution was induced by misrepresentation of material facts. La. R.S. 40:1299.40(A)(1). Ms. Jackson has not established that misrepresentation of material facts induced her to sign the form. Because Ms. Jackson gave conflicting versions of signing the form, the trial court could have disbelieved her claim that she signed a blank form. The presence in the record of suspect consent forms from years before and about which nothing is known does not establish a practice by Conway of having patients sign blank consent forms at admission nor does it call into question the validity of the fully executed consent form in this instance. Thus, we find no merit to Ms. Jackson's claim that she signed a blank form.
Ms. Jackson also claims there are other problems with the consent form that establish lack of informed consent. She claims that she did not consent to removal of her uterus and ovaries. She notes the appearance of the names of both Dr. Kleinpeter and Dr. Swiger on the form, the lack of explanation as to the meaning of "if indicated" used in reference to removal of her uterus and ovaries, the lack of any mention of menopause on the form, and the change in treatment plan from Lupron injections to immediate surgery as grounds for finding a lack of informed consent. We will review the relevant testimony to address these complaints.
Ms. Jackson denied any conversations with her physicians prior to surgery about the risks involved or the procedures to be done. At her deposition, a copy of which was admitted into evidence, she recalled meeting with three doctors, one an older man and two younger men, about a week before surgery at which time they talked about giving her Lupron prior to performing surgery but then told her that they wanted to go ahead with surgery to remove the fibroid tumor and unblock her tubes. She recounted being told that the fibroid tumor might be enlarged, pressing against her uterus, and closing her fallopian tubes. Ms. Jackson denied that any doctors told her prior to surgery that they might have to do a hysterectomy or remove her ovaries. She testified that she did not even know what a hysterectomy was until it was explained to her when she was finally told what surgery had been done at a follow-up visit on February 21, 1995.
Dr. Bowling, Ms. Jackson's expert, was critical of Conway's efforts to obtain consent for the surgery and believed that Ms. Jackson did not fully understand the procedure and risks. She found the consent form inadequate in that it failed to properly note the risks and provided no explanation of what "if indicated" meant. Dr. Bowling explained that hysterectomy is a risk of a myomectomy in circumstances where intractable bleeding occurs. Thus, hysterectomy should have been listed as one of the risks. Dr. Bowling also believed that Ms. Jackson was not informed after surgery that her uterus and ovaries had been removed. She felt that Ms. Jacksons' shock at finding out what was done to her indicated that she was not properly informed prior to surgery and did not give informed consent.
Dr. Wise believed that the consent form signed by Ms. Jackson was proper. He did find it "perplexing" that the medical records included a note on February 21,1995, indicating that the procedure was fully explained to Ms. Jackson on that day. He suggested that she was either not informed or in denial, but he concluded that Ms. Jackson's consent had been properly *261 obtained. Dr. Wise testified that the possibility that a TAH/BSO might have to be done was noted throughout Ms. Jackson's medical chart and on the consent form. He also testified that Dr. Swiger's conversation with Ms. Jackson regarding the procedure, risks, and signing of the consent form was documented in the progress notes. Dr. Wise explained that the phrase "if indicated" is commonly used on consent forms and that it signifies the exercise of medical judgment as to what is needed at the time of surgery. He noted that it is something impossible to explain completely prior to surgery. When questioned about why Dr. Kleinpeter's name was on the form when Dr. Swiger signed it, Dr. Wise explained that Conway's staff and residents work as a team and that it would not be unusual for one physician to write in the information and another to then have the actual discussion with the patient and obtain the signatures. He concluded that he had never encountered a situation where the patient's signature was obtained prior to filling out the consent form.
Eunice Lee, the nurse who signed the consent form as a witness, did not recall the actual signing of the form. However, she testified she never witnessed a physician present a blank form to be signed nor did she ever see anything added to a form after it was signed.
Dr. Swiger's affidavit states that it was his practice and Conway's policy to inform the patients in the presence of a nurse of the expected procedures, any possible complications, and alternative procedures. The affidavit further states that he discussed the procedure with Ms. Jackson and obtained her consent in the presence of Nurse Lee. The affidavit states that he advised Ms. Jackson in general terms that he would remove the fibroids and attempt to clear her tubes, and that if indicated he would have to remove her uterus, tubes, and ovaries. He also advised of the risks of bleeding, infection, infertility, and ectopic pregnancy as set forth on the consent form.
From this evidence, we find no deficiency in informed consent due to the appearance of both Dr. Kleinpeter's and Dr. Swiger's names on the form. As explained at trial, Conway serves as a teaching hospital and utilizes a team approach in treating patients. Nothing in the record shows this to be a defect that would nullify informed consent. Nor do we find any deficiency in informed consent due to the decision to proceed to surgery without the Lupron therapy. Ms. Jackson clearly agreed to this course of action by submitting to surgery. Her remaining complaints require a closer analysis.
The consent form describes the planned procedure as a myomectomy and neosalpingostomy and provides that the TAH/BSO will be performed "if indicated." The form explains the procedure in general terms as removal of the fibroids and attempt to clear the tubes. It goes on to state, "If indicated will remove my uterus, tubes and/or ovaries." As written, the form identifies TAH/BSO as an alternate procedure. The form provides clear notice of planned procedures, what might occur during surgery, namely that the uterus and ovaries might be removed, and the risks associated with the planned procedures to remove the fibroids and open the fallopian tubes. The form also identifies infertility as a risk of surgery. Considering the clear language of the form, we find no merit to Ms. Jackson's claim that she was not informed that her uterus and ovaries might be removed.
While the consent form put Ms. Jackson on notice of the planned procedures and the possibility that her uterus and ovaries might be removed, it did not *262 explain that surgically induced menopause would result from removal of the ovaries. We find no merit in Conway's assertion that listing infertility as a risk was sufficient to put Ms. Jackson on notice of surgically induced menopause. The physicians might not have gone into the surgery with the initial intent to remove Ms. Jackson's uterus and ovaries, but they certainly believed that removal of her reproductive organs was a real possibility as evidenced by inclusion of the TAH/BSO on the consent form as a procedure to be done "if indicated." Having apprised Ms. Jackson of the possibility that her ovaries might be removed, they should have made clear to her that this would result in surgically induced menopause.
We find that early menopause was a material risk of the surgery that Ms. Jackson underwent and that a reasonable person in her position, namely a 34-year old woman, would have attached great significance to that risk in deciding whether to consent to the procedure. Having thoroughly reviewed the record, we cannot say that a reasonable person in Ms. Jackson's position would have consented to the removal of her ovaries had the risk of menopause been disclosed. Ms. Jackson was a relatively young woman at the time of surgery. She underwent surgery in the hope that it would correct the problems that had prevented her from becoming pregnant. She wanted the fibroids removed and even after surgery believed that was all that had been done. We found that removal of the ovaries was not medical malpractice; it was a medical judgment call based on the physicians' opinions of what would be best to avoid possible complications and future problems. Removal of the ovaries was not due to any life-threatening condition or crisis during surgery. The judgment call to remove the ovaries was made without the benefit of Ms. Jackson having been informed that removal of her ovaries would result in menopause. We cannot say that a reasonable person in Ms. Jackson's position would have consented to removal of her ovaries and resulting menopause under the circumstances present in this case.
The failure to obtain informed consent for removal of Ms. Jackson's ovaries certainly resulted in damages by inducing menopause at the age of 34. Ms. Jackson lost the benefit of hormone production as a result of her ovaries being removed. She was placed on hormone therapy with estrogen following surgery, but this was later discontinued due to her inability to tolerate the hormone replacement. The record establishes that as a result of early menopause, Ms. Jackson will likely suffer from hot flashes, vaginal atrophy, and vaginal dryness. She is also at a greater risk for developing osteoporosis and heart disease. We are not awarding any damages for infertility in connection with removal of her ovaries as the record establishes the Ms. Jackson's fertility was compromised by the conditions for which she underwent surgery and not caused by removal of her ovaries. Under the circumstances of this case and the evidence adduced at trial, we find that an award of $25,000 in general damages will compensate Ms. Jackson for the removal of her ovaries without informed consent as to the risk that menopause would result and for the shock she suffered in learning that her ovaries had been removed and that menopause had been induced by the surgery.

CONCLUSION
For the reasons expressed in this opinion, we affirm the trial court's judgment dismissing Ms. Jackson's medical malpractice claims against the State of Louisiana, Department of Health and Hospitals and *263 E.A. Conway Memorial Hospital for removal of her uterus and ovaries. However, we reverse the trial court's denial of her claim based on lack of informed consent insofar as she was not informed that removal of her ovaries would induce menopause. Damages are awarded in the amount of $25,000. Costs of appeal are assessed against the state pursuant to La. R.S. 13:5112 in the amount of $976.50.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] The explanations enclosed in parentheses were not included in the consent form.
[2] Throughout the medical records the hysterectomy and salpingo-oophorectomy are referred to as a "TAH/BSO," and this abbreviation will be used in this opinion.