701 So.2d 447 (1997)
Milton C. LUGENBUHL, et al.
v.
Dr. James DOWLING, et al.
Wenonah Lugenbuhl, Wife of/and Milton C. LUGENBUHL, Jr. et al.
v.
James B. DOWLING, M.D., et al.
No. 96-C-1575.
Supreme Court of Louisiana.
October 10, 1997.
Rehearing Denied November 21, 1997.
*448 Stewart Earl Niles, Jr., Patricia Anne Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Applicant.
John Wayne Mumphrey, for Respondent.
LEMMON, Justice.
This is an action by a patient against his physician for damages allegedly caused by the doctor's failure to use surgical mesh, as requested by the patient, in repairing an incisional hernia. The principal issues before this court are (1) whether the doctor, in view of the patient's expressed desire that mesh be used in the surgery, properly informed the patient regarding the nature of the proposed procedure and its advisability and attendant risks with and without the use of mesh, and (2) whether plaintiff proved a causal connection between (a) either any lack of informed consent or the doctor's failure to use mesh and (b) the damages awarded for the subsequent additional surgery.

*449 Facts

In November 1987, plaintiff consulted Dr. John Dowling, a general surgeon, to repair an intracostal incisional hernia (hereinafter referred to as the cardiac incisional hernia)[1] that had developed from 1985 coronary bypass surgery.
Plaintiff had a history of hernia problems, having undergone three unsuccessful inguinal hernia repairs by another surgeon between 1963 and 1974 before the surgeon performed a successful procedure in 1975 using surgical mesh.[2] Because of his prior experience, plaintiff expressed to Dr. Dowling in 1987 his desire that the required surgery be performed with mesh.
In preparation for the surgery, plaintiff signed a consent form which stated in pertinent part:
1) I hereby authorize and consent to Dr. Dowling, M.D., and such supervising physicians, surgeons, assistants of his or her choice, to perform upon myself the following surgical, diagnostic, medical procedure Repair incisional hernia with Mesh including any necessary and advisable anesthesia.
2) I understand the nature and purpose of this procedure to be Repair Incisional Hernia with Mersilene Mesh
(Underscored words are handwritten by Dr. Dowling on a printed form).
During the cardiac incisional hernia repair procedure, Dr. Dowling made the decision not to use mesh based on his intraoperative assessment of plaintiff's condition.
Between November 1987 and April 1988, Dr. Dowling performed two additional operations on plaintiff, first to remove his diseased gallbladder and later to reclose the gallbladder surgery incision site, which had opened when plaintiff coughed.
In May 1988, plaintiff developed a large herniated area in his abdominal region. This large herniated area included the site of the small cardiac incisional hernia repair performed by Dr. Dowling.
Dr. C. Edward Foti surgically repaired the large herniated area, using mesh primarily because of the size of the hernia. Plaintiff subsequently developed a small incisional hernia at the site of the surgical drain placed in plaintiff's abdomen during the surgery performed by Dr. Foti. This small hernia was repaired by Dr. Foti using mesh.
Plaintiff filed this action against Dr. Dowling, asserting claims based on medical malpractice and on lack of adequate informed consent. Plaintiff alleged that Dr. Dowling's failure to use mesh to repair the cardiac incisional hernia in 1987 caused the subsequent herniation in 1988 and necessitated further surgery.
The jury rendered a verdict in favor of plaintiff for $300,000.[3] Answering special interrogatories, the jury found that Dr. Dowling was liable for damages based both on medical malpractice and on failure to obtain informed consent.[4]
The court of appeal affirmed in a divided decision. 95-1557 (La.App. 4th Cir. 5/15/96); 676 So.2d 602. The majority opinion, based on lack of informed consent, concluded that Dr. Dowling had failed to disclose the material information that he would not use mesh if he, in exercising his medical judgment, reevaluated the need for mesh during the surgery. *450 The majority thus did not reach the medical malpractice issue, although the concurring judge expressed her opinion that both lack of informed consent and medical malpractice had been proved. The dissenting judge concluded that Dr. Dowling, after making the promise so important to plaintiff, had no right to disregard the promise, but that plaintiff failed to prove Dr. Dowling's conduct caused the claimed damages or that the use of mesh would have prevented the subsequent problems. The dissenting judge would have awarded only nominal damages.
On Dr. Dowling's application, this court granted certiorari to review the significant informed consent issue, as well as the related causation issue. 96-1575 (La.10/4/96); 679 So.2d 1363.

Lack of Informed Consent Generally
The requirement of consent to medical treatment was initially based on the idea that a competent person has the right to make decisions regarding his or her own body. As Justice Cardozo stated in Schloendorff v. Society of N.Y. Hosp., 211 N.Y. 125, 105 N.E. 92, 93 (1914), "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages."
After the early cases struggled with the concept of consent that may be implied from the circumstances, including the patient's silence, there was a gradual development of a duty imposed on doctors to disclose information to the patient in order to afford the patient the opportunity of making an informed choice about proposed medical procedures. Significant litigation ensued concerning the scope of the doctor's duty to provide informed consent.
In 1975, the Louisiana Legislature enacted La.Rev.Stat. 40:1299.40 A and B relative to informed consent to medical treatment, and Subsection C was added the following year. La.Rev.Stat. 40:1299.40 A-C now provide:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
(2) In addition to the information required to be disclosed in Paragraph (1) of this Subsection, where the medical treatment involves the surgical implantation of "Norplant" contraceptive devices, the explanation to the patient shall include the known and significant or other material risks, the known adverse results, and alternative methods of contraception.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
*451 This court first addressed the informed consent statute in LaCaze v. Collier, 434 So.2d 1039 (La.1983). There, after several years of treatment for severe pelvic inflammatory disease, the patient accepted the doctor's recommendation of a hysterectomy. The patient signed two consent forms. The first was essentially blank, and the second listed only the type of surgery, without listing any risks or acknowledging that disclosures had been made or questions answered.
After the surgery, a vesico-vaginal fistula developed, requiring additional surgery. The patient sued on the basis that the doctor made insufficient disclosure of the surgical risks to obtain a valid informed consent.
This court held that the consent forms did not satisfy the statutory requirements, but concluded that the lack of informed consent did not give rise to any damages. This court reasoned that the patient failed to prove causation of the claimed damages because a reasonable person in the patient's position would have consented to the surgery even if the doctor had disclosed the risk that materialized.
In Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 437 So.2d 859 (La.1983), the doctor, after conservatively treating the patient's lower abdominal pain, prescribed exploratory abdominal surgery (laparotomy) to determine the cause of the pain. The consent form signed by the patient listed "(1) Pelvic inflammatory disease, marked (2) endometriosis" as the diagnosis and "Laparotomy-Lysis of adhesions, Fulguration of endometrioma" as the recommended procedure. Although the doctor noted "probable salpingo-oophorectomy" (the surgical removal of the ovary and its fallopian tube) on the admission chart, he did not inform the patient, who desired to have children, of this probability.
During surgery, the doctor removed the patient's severely damaged reproductive organs, believing that the patient was sterile and that further pain would necessitate additional surgery.
This court, concluding that the doctor removed the patient's reproductive organs without obtaining her implied or expressed consent to that operation, held that the doctor committed a battery and remanded the case to the court of appeal to determine the damages due for that tort.
In Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988) (on rehearing), the patient consulted the doctor about low back pain that radiated into the hip and leg. After attempting conservative treatment, the doctor recommended a myelogram and a laminectomy. The consent form signed by the patient, essentially tracking the general risks stated in the statute, listed the risks of this procedure as "anesthesia; death; brain damage; disfiguring scars; paralysis; the loss of or loss of function of body organs; and the loss or loss of function of any arm or leg."
After the surgery, the patient experienced incontinency, constipation and numbness in the leg. She filed suit on the basis that she would not have undergone the surgery if she had been informed of these known material risks.
This court first noted that:
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.
Id. at 411. Explaining further, this court stated:
The determination of materiality [of a risk] is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging that risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position *452 probably would attach significance to the specific risk.
Id. at 412.
Reversing a summary judgment in favor of the doctor, this court held that the issues of whether the loss of bladder control was a material risk which was not disclosed to the patient and whether a reasonable person in the patient's position would have refused the operation, had she been advised of the risk, were issues triable on the merits. Id. at 421-22.
Liability in the Pizzalotto case was based on commission of a "battery" because the doctor, although obtaining consent to perform a laparotomy and to unbind the adhesions and fulgurate the endometrioma, performed other anticipated procedures for which he did not have consent. We deem it appropriate to clarify now the use of the term "battery" in the Pizzalotto case.
While the early development of liability for failing to obtain informed consent was based on concepts of battery or unconsented touching, the imposition of liability in later cases has been based on breach of a duty imposed on the doctor to disclose material information in obtaining consent. Such a breach of duty by the doctor results in liability based on negligence or other fault. While perhaps the performance of a medical procedure without obtaining any kind of consent, in the absence of an emergency, technically constitutes a battery,[5] liability issues involving inadequate consent are more appropriately analyzed under negligence or other fault concepts. See W. Page Keeton et al, Prosser and Keeton on the Law of Torts 190 (5th ed. 1984) ("Beginning around 1960, however, it began to be recognized that the matter was really one of the standard of professional conduct, and so negligence has now generally displaced battery as the basis for liability"); 1 Fowler V. Harper et al., The Law of Torts § 3.10 & nn. 36-38 (3d ed. 1997) ("The problem of informed consent is essentially one of professional responsibility, not intentional wrongdoing, and can be handled more coherently within the framework of negligence law than as an aspect of battery."); 4 Stuart M. Speiser et al., The American Law of Torts § 15.71 n. 21 (noting that "more and more courts have turned to the theory of negligenceprofessional malpracticeas the basis for suits predicated on lack of informed consent"); David W. Robertson et al., Cases and Materials on Torts 608 n. 1 (1989) ("modern courts analyze the adequacy of consent as a question of negligence, not battery"); 3 David W. Louisell & Harold Williams, Medical Malpractice § 22.03[2] (1997); Frank L. Maraist & Thomas C. Galligan, Jr.,Louisiana Tort Law § 2-9(a) (1996) ("most modern authorities now treat lack of informed consent as a negligence, i.e., malpractice matter"); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (1960); Woolley v. Henderson, 418 A.2d 1123 (Me.1980).
The Louisiana Legislature has also specified the theory of recovery in lack of informed consent claims as properly based on traditional fault theories, apparently to bring such claims under the Medical Malpractice Act. By La. Acts 1990, No. 1093, the Legislature amended La.Rev.Stat. 40:1299.40 to add Subsection E, which establishes the Louisiana Medical Disclosure Panel to determine the risks and hazards related to medical care and surgical procedures that must be disclosed to the patient. Pertinent to the present discussion, Subsection 1299.40 E(2)(a) provides:
In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the *453 only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent. (emphasis added).
We therefore reject battery-based liability in lack of informed consent cases (which include no-consent cases) in favor of liability based on breach of the doctor's duty to provide the patient with material information concerning the medical procedure.
Lack of Informed Consent in the Present Case
In support of his contention that Dr. Dowling is liable for damages based on lack of informed consent, plaintiff testified he repeatedly informed Dr. Dowling prior to his cardiac incisional hernia repair that he wanted the doctor to use mesh to close the wound, believing that three of his four prior inguinal hernia repairs had failed because mesh was not used. According to plaintiff, Dr. Dowling promised he would use mesh in the operation and noted the use of mesh on the consent form, and Dr. Dowling never told plaintiff of any risks involved in using mesh or that a decision whether to use mesh would be reserved until during surgery. Had Dr. Dowling told him the decision whether to use mesh would only be made during surgery, plaintiff asserted he would have sought another doctor. This testimony was corroborated by plaintiff's wife.
Dr. Dowling testified that he discussed the use of mesh with plaintiff and that its use was an option during surgery. The doctor stated he never committed to the use of mesh or promised it would be used, and if plaintiff had insisted on such a promise, he would have told plaintiff to find another surgeon.[6] He believed plaintiff understood that mesh was an option and that Dr. Dowling would make the decision whether to use mesh according to the conditions found during the surgery. Dr. Dowling insisted that he included similar language in every consent form for hernia repairs, meaning that he was authorized to use mesh if he determined during the surgery that its use was required.
Plaintiff's wife testified that she asked Dr. Dowling immediately after the operation if he had used mesh, and he told her he had not "because I don't like it." This testimony was corroborated by her daughter. Plaintiff testified that when he asked Dr. Dowling about the decision not to use mesh, Dr. Dowling stated he had sutured the hernia repair in such a way that the sutures would not fail.
Dr. Dowling denied that he said he had used any special sutures or that he said the sutures would not fail. He also denied telling plaintiff's wife that he did not like to use mesh.
The jury apparently accepted plaintiff's testimony, corroborated by that of his wife and daughter, that the doctor agreed to plaintiff's steadfast demand for the use of mesh and simply disregarded that agreement during the surgery. The plain language of the written consent form clearly supports the jury's determination. The term "incisional hernia repair" was sufficient to authorize that surgical repair using normal procedures within the surgeon's judgment; there was no necessity to use the words "with mesh" except to confirm the patient's request.
An appellate court, in reviewing a jury's determination that a doctor failed to obtain the patient's informed consent, should focus on the duty of the doctor to provide material information to the patient under the circumstances of the particular case. Here, the patient, regardless of the validity of his conviction, believed that previous hernia repairs had failed because of the non-use of mesh and conditioned his consent to the surgery upon the use of mesh. Under the evidence viewed in the light most favorable to the party who prevailed before the trier-of-fact, *454 the doctor understood and agreed to the condition, indicating that agreement in plain language on the written form.
Under these circumstances, it was incumbent upon the doctor to explain to the patient the advantages and disadvantages in the use of mesh, the attendant risks, and the necessity of reserving the decision on the use of mesh to the surgeon during the course of the operation. The doctor, under the record-supported decision of the jury, failed to discharge that duty in this case. Accordingly, the doctor failed to obtain adequate informed consent to the surgery that he anticipated and performed, and deprived the patient of the opportunity to decide, with appropriate material information, whether he wanted to have the hernia repair only with mesh and to reject a medical procedure that he did not want. Because of the breach of duty, the doctor is liable for the damages caused by that breach of duty.

Causation of Damages
The plaintiff in a lack of informed consent case must prove not only that the physician failed to disclose all material information, but also that there was a causal relationship between the doctor's failure and the damages claimed by the patient. LaCaze, 434 So.2d at 1048. Otherwise, the doctor's conduct, however wrongful, is legally inconsequential. Id.
There are two aspects to the proof of causation in a lack of informed consent case. First, the plaintiff must prove, as in any other tort action, that the defendant's breach of duty was a cause-in-fact of the claimed damages or, viewed conversely, that the defendant's proper performance of his or her duty would have prevented the damages. Second, the plaintiff must further prove that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure, had the material information and risks been disclosed. LaCaze, 434 So.2d at 1048; Hondroulis, 553 So.2d at 412; Canterbury v. Spence, 464 F.2d 772, 790 (D.C.Cir. 1972). Causation is established only if adequate disclosure reasonably would be expected to have caused a reasonable person to decline treatment because of the disclosure of the risk or danger that resulted in the injury. Canterbury, 464 F.2d at 791. Although the patient has the absolute right, for whatever reason, to prevent unauthorized intrusions and treatments, he or she can only recover damages for those intrusions in which consent would have been reasonably withheld if the patient had been adequately informed. LaCaze, 434 So.2d at 1049.
As to the principal claim for damages in the present case (the subsequent massive herniation in 1988), we need not discuss whether a reasonable person in plaintiff's position would have consented to the cardiac incisional hernia repair if the person had been informed that mesh might not be indicated or used. Based on the complete record, plaintiff has failed to satisfy the threshold element of causation-in-fact. There is no medical evidence from which a rational juror could conclude that Dr. Dowling's failure to use mesh in the cardiac incisional hernia repair caused the plaintiff's subsequent massive herniation.
Dr. Foti, the expert called by plaintiff, testified that Dr. Dowling's failure to use mesh in the cardiac incisional hernia repair had nothing to do with plaintiff's subsequent medical conditions. Dr. Foti stated that the hernia he repaired was a very large and complex defect which extended into the area of the cardiac incisional hernia, but that the two areas could not be distinguished from each other. From an etiological standpoint, however, he believed that the major hernia he repaired stemmed from a separation of the abdominal wall after the unrelated gallbladder surgery.[7] Dr. Foti further testified that he believed there was nothing Dr. Dowling *455 failed to do which caused the herniation for which he operated on the plaintiff.
Inasmuch as plaintiff failed to prove that the use of mesh in the cardiac incisional hernia repair would have prevented any of his subsequent problems, we conclude that Dr. Dowling's failure to use mesh in accordance with plaintiff's request was not a cause-in-fact of the subsequent massive herniation suffered by plaintiff.
Nevertheless, the doctor's breach of duty cannot fairly be said to have resulted in no injury whatsoever. Although we do not base the doctor's liability on a theory of battery, the damages sustained by plaintiff in this case appear to be the type of damages contemplated by the majority of this court in remanding the Pizzalotto case to the court of appeal to fix damages based on a battery.[8] While we have herein rejected battery as the basis for analyzing liability in lack of informed consent cases, some of the damages generally awarded in battery cases are applicable in our discussion of damages in this case.
This case is different from the usual lack of informed consent cases where the doctor failed to inform the patient of a material risk and the risk materialized to cause physical damages. Here, the doctor's failure to inform the patient adequately did not cause the patient to undergo a risk that materialized and caused physical damages.[9] Rather, the doctor's breach of duty caused plaintiff to undergo a medical procedure to which the patient expressly objected and for which the doctor failed to provide adequate information in response to the patient's request, thereby causing damages to plaintiff's dignity, privacy and emotional well-being. The doctor, rather than explaining the advantages and disadvantages of the patient's express request, patronized his patient and mentally reserved the right to decide to disregard the patient's expressed wishes. Even the dissenting judge in the court of appeal noted that plaintiff is entitled to an award of damages for being deprived the opportunity of self-determination in regard to subjecting himself to an unwanted procedure.
The difficult question is the type of damages to be awarded. While plaintiff failed to prove physical damages or pecuniary loss, he is still entitled to an award of general compensatory damages caused by the doctor's breach of duty. In this type of case, damages for deprivation of self-determination, insult to personal integrity, invasion of privacy, anxiety, worry and mental distress are actual and compensatory. See 2 Dan B. Dobbs, Law of Remedies, §§ 7.1-7.3 (1993) (discussing damages for "dignitary torts"[10] where the law seeks to protect the plaintiff's intangible interest in personal integrity and privacy, as well as mental tranquility). See also Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955); (two plaintiffs awarded $250 each, in addition to property damage awards, where defendants were absolutely liable for use of explosives in seismological exploration); Ard v. Samedan Oil Corp., 483 So.2d 925 (La.1986) (two plaintiffs awarded $10,000 and $7,500 respectively, plus property damage award, for trespass by seismology team who trampled fences on plaintiffs' cattle lands); Guy v. ABC Ins. Co., 629 So.2d 1350 (La.App. 4th Cir.1993) (three plaintiffs awarded $3,500, $3,500 and $5,000 respectively where police conducted warrantless search of home but caused no property damage); Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 444 So.2d 143 (La.App. 1st Cir.1983) (on remand) (damages based on battery theory of lack of consent). This is not a case of mental distress caused by harm to plaintiff's property, for which an award of damages has caused much debate. Rather, the injury was to plaintiff's personal *456 dignity and right of privacy, an injury for which an award of damages generally is considered appropriate. The primary concern in this injury to the personality is vindication of valuable, although intangible, right, the mere invasion of which constitutes harm for which damages are recoverable. Dobbs, supra, at § 7.1(1).
On remand in Pizzalotto, the court of appeal awarded $10,000 based on the patient's "shock" at learning that she had undergone a procedure she had not expected, as well as the added pain and recovery time she experienced due to the more extensive operation that she underwent. Pizzalotto, 444 So.2d at 144. In this case, plaintiff experienced similar shock and mental distress when he learned that his express desire for a repair with mesh had been disregarded. Unlike the plaintiff in Pizzalotto, however, plaintiff in this case did not undergo a more extensive procedure than the one he expected. Accordingly, we fix his compensatory damages at $5,000, proportionate to the damages awarded in Pizzalotto on remand.
In summary, we reduce the jury's total award of damages, which included the damages attributable to the massive herniation that was not proved to have been caused by the doctor's failure to provide material information and to obtain adequate informed consent, from $300,000 to $5,000. We also reverse the unsupported jury finding that plaintiff was ten percent at fault.

Medical Malpractice
The claims in this case throughout have been separated into lack of informed consent and medical malpractice claims.[11] The jury found the doctor liable on both claims. The court of appeal, basing liability on lack of informed consent, pretermitted discussion of liability for separate medical malpractice in failing to meet the appropriate standard of care during the performance of the surgery. Because the record clearly does not support the jury's finding of any medical malpractice separate from the breach of duty to obtain informed consent, we will treat the issue briefly rather than remanding to the court of appeal.
To prove medical malpractice, a plaintiff must prove the prevailing standard of care, the health care provider's violation of that standard of care, and the causal connection between the health care provider's alleged negligence and the plaintiff's claimed injuries. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94); 643 So.2d 1228; La.Rev.Stat. 9:2794. The standard of care is generally that degree of knowledge or skill possessed or the degree of care ordinarily exercised by doctors licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. La.Rev.Stat. 9:2794 A(1).
The medical evidence on this issue was entirely in Dr. Dowling's favor. Dr. Foti repeatedly testified that Dr. Dowling did not violate any standard of care in any of his treatment. Moreover, as noted above, Dr. Foti could not say that Dr. Dowling's repair of the cardiac incisional hernia failed or that any deficiency in the repair caused the abdominal hernia which Dr. Foti later repaired and for which plaintiff sought damages. From an etiological standpoint, Dr. Foti believed the massive abdominal hernia started from the separation of the abdominal wall after the gallbladder surgery. Dr. Foti further opined that there was no negligence in the manner in which Dr. Dowling performed the gallbladder operations and that no action or inaction by Dr. Dowling in either procedure caused the herniation for which he operated on the plaintiff.
The jury's determination of liability based on medical malpractice must be set aside.

Decree
For the foregoing reasons, the judgment of the lower courts is amended to reduce the amount of damages to $5,000.
Johnson, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[1] There are two types of hernias involved in plaintiff's medical history. An inguinal hernia is a protrusion of abdominal tissue through the inguinal canal, a natural internal passageway in the groin area through which the testicle descends during fetal development and which remains more or less always open to allow passage of the spermatic cord. An incisional hernia is a protrusion at any area weakened or scarred by an incision. Black's Medical Dictionary 441 (32nd ed.1979).
[2] In the 1975 surgery, plaintiff's testicle was removed and the inguinal canal was closed completely.
[3] At the completion of the evidence by plaintiff and defendant, the trial judge granted a directed verdict in favor of Dr. Dowling on the medical malpractice claim, but reserved the informed consent claim for the jury's determination. On plaintiff's application for supervisory writs, the court of appeal ordered that all issues be submitted to the jury.
[4] The jury unexplainedly allocated ten percent of the fault to plaintiff.
[5] See Roberson v. Provident House, 576 So.2d 992 (La.1991) (nurse's insertion of an in-dwelling catheter into the quadriplegic patient's bladder through his penis, without his consent and over his objection in a non-emergency situation, constituted a battery for which the hospital was liable for mental and physical pain and suffering aggravated by complications that developed after the nurse jerked the catheter out of the patient). On the other hand, one can hardly argue that it is not below the appropriate standard of care for a doctor or nurse to perform a medical procedure without obtaining any kind of consent.
[6] Explaining why he did not use mesh in this particular operation, Dr. Dowling testified the hernia was small and the tissues came together easily. Other evidence established that there were risks in the use of mesh, which introduces a foreign body into the patient. These risks include an increased risk of infection, fibrosis, scarring and pain. See, e.g., Wright v. State of Louisiana d/b/a Medical Center of Louisiana at New Orleans, et al., 93-3095 (La.7/5/94); 639 So.2d 258 (mesh used to repair inguinal hernia became wrapped around spermatic cord, necessitating eventual removal of testicle).
[7] Plaintiff asserted that the lack of informed consent carried over to the gallbladder surgery in which he did not insist on the use of mesh, purportedly because of Dr. Dowling's assurances that his special manner of stitching would not fail. This assertion, supported only by plaintiff's testimony as to his subjective state of mind, does not affect our decision. Because the testifying physicians agreed that using mesh to close a gallbladder incision is fraught with risk to the patient, the decision whether or not to use mesh in such surgery is a complex medical issue requiring expert testimony to sustain the plaintiff's burden on these issues. See Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94); 643 So.2d 1228. Thus, even if lack of informed consent was proved, plaintiff clearly failed to show either that a reasonable person in his position would have foregone the gallbladder surgery without mesh or that the use of mesh in the gallbladder surgery would have prevented the subsequent herniation.
[8] On remand in Pizzalotto, the court of appeal fixed the damages at $10,000.
[9] Thus the usual causation inquiry into whether a reasonable person in the patient's position would have consented if he or she had known of the risk that materialized is not applicable here.
[10] One of the dignitary torts is battery. While we have rejected, as did the Legislature, the theory of battery for analyzing liability in lack of informed consent cases, the type of damages generally awarded in a battery case is also applicable here.
[11] Plaintiff's medical malpractice claim originally included Dr. Dowling's cardiac incisional hernia repair, as well as his treatment of plaintiff's gallbladder problems which necessitated two additional surgical procedures. Plaintiff has now expressly abandoned his malpractice claims regarding Dr. Dowling's treatment of his gallbladder problems.