SUSAN M. CHEHARDY, Judge.
| pThis is an appeal by plaintiffs, Aliene Sumráll Packard and Kenneth C. Packard, from a trial court judgment that granted a defense motion for summary judgment and dismissed plaintiffs’ medical malpractice claim against defendant, Dr. Bruce Razza. For reasons that follow, we affirm.
The judgment presented for our review arises from a medical malpractice claim made against Dr. Razza and Elmwood Medical Center as a result of a spinal fusion performed by Dr. Razza in 1991. The petition for medical malpractice alleges that Dr. Razza deviated from the standard of care by failing to inform Aliene Sumrall Packard that the Luque spinal fixation plate system utilizing pedicle screws implanted during the operation was not approved for use by the Federal Drug Administration (FDA). In the petition plaintiffs allege that the spinal fixation devise was defective, and that breaches of the standard of care included two unsuccessful lumbar surgeries, ultimately necessitating an additional surgery to remove the devise. It is also alleged that permanent and disabling injuries resulted from the breach of the standard of care.
lain a supplemental and amending petition, Mrs. Packard alleged that Dr. David Baron performed an operation in March of 1999 to remove the Luque pedicle screw devise that was implanted in her spine by Dr. Razza. As a result of that surgery she contracted an infection which required her to be hospitalized on several occasions.
Defendants filed an exception of prescription asserting the complaint requesting a review by a medical review panel in accordance with La. R.S. 9:5628 was untimely filed as to the 1991 surgery. That exception was denied by the trial court. This Court reviewed that decision under the grant of supervisory jurisdiction and granted the application, reversing the trial court and granting the exception of prescription as to the claims of malpractice made concerning the 1991 surgery.[1] That ruling was overturned by the Louisiana Supreme Court and the ruling of the trial court was reinstated.[2]
Dr. Razza filed a motion for summary judgment. After consideration, the trial court granted the motion. It is that ruling that forms the basis for this appeal.
It is clear from the record that plaintiff, Aliene Packard, has had chronic spinal problems since she injured her neck and back in an automobile accident in 1985. At that time, she underwent cervical fusion, which was unsuccessful. In 1989, Mrs. Packard re-injured her neck and back in a second automobile accident. In November of 1990, Mrs. Packard consulted Dr. Razza. In April of 1991, when conservative treatment failed, Dr. Razza performed a bone graft fusion from the L4 to the sacrum using Luque plates and pedicle screws to anchor the bone graft. About one week later, Dr. Razza performed a second surgery on the cervical area of the spine to revise the earlier C4-5 fusion done after the 1985 automobile accident.
| ¿Unfortunately, Mrs. Packard was involved in a third automobile accident in February of 1992. Mrs. Packard continued to treat with Dr. Razza and, in March of 1993, she underwent surgery to remove and re-implant the Luque plates and pedi- *531 cle screws. In 1995, when she saw a television show discussing the use of Luque plates and learned that they were not yet approved by the FDA, Mrs. Packard filed suit this action Dr. Razza.
Mrs. Packard subsequently moved to Colorado and in March of 1999 elected to have the Luque plates and screws removed during a surgery to repair a torn rotator cuff. As a result of that surgery, Mrs. Packard contracted an infection and filed suit in Colorado against the treating physician and the hospital.
Before the surgery to implant the devise to stabilize the spinal fusion in 1991, Mrs. Packard signed at least two consent forms which are contained in the record. Some of the information contained in those consent forms reads as follows;
I am fully aware of the unstable condition of my spine and I hereby authorized Dr. Razza_To perform a spinal fusion utilizing an internal fixation device, specifically LSF Luque Plates, pedicle screws, hooks, for the fixation and stabilization of the spine.
Dr. Razza has discussed with me the items of information that are briefly summarized below:
(a) The nature and purpose of the proposed procedure(s).
(b) The risks and possible complications of the proposed procedure(s), including the risk that such treatment may not accomplish the desired objective(s).
(c) The possible or likely consequences of the proposed procedure including the fact that at some future time the internal fixation device or devices named above may have to be removed surgically.
(d) All feasible alternative treatments .
4. I have had sufficient opportunity to discuss my condition and treatment with the doctor and his associates, and all of my questions have been answered to my satisfaction. I believe that I have adequate knowledge upon which to base an informed consent to the proposed treatment.
| .Additionally, the form fully explained the use of metallic surgical implants and the specific risks, including infection.
The record also contains a 1991 “Consent for Medical Procedure and Acknowledgment of Receipt of Information” signed by Mrs. Packard. That form contains the following acknowledgement, “I hereby state that I have read and understand this consent, all questions about the procedure or procedures have been answered in a satisfactory manner.... ”
The record contains the deposition of Dr. Razza, who explained the two surgeries in 1991 and 1993 were necessary to stabilize Mrs. Packard’s spine. He stated that the majority of the decompression was done in the first surgery with use of the pedicle screws. The second surgery, necessary to relieve pain after the second automobile accident, added to that decompression. At the time of the second surgery, the plate and screws were removed and inspected before re-implantation. He explained the sterilization process used during that process.
Dr. Razza further testified that he has a format in the explanation of this surgery with his patients. He recalled discussing with Mrs. Packard the option of using the plate and screws. They discussed the options of using the device or not using it. His explained to Mrs. Packard that this is an elective internal fixation device, not specifically approved by the FDA, but it can be used in bone. In Dr. Razza’ opinion, it was the device that would more likely than not give her the best possible *532 chance at a good surgical outcome. This plate and screw is used by many physicians who do spinal surgery. He also testified that he gave Mrs. Packard the option of fusing without instrumentation.- Before the surgery, Dr. Razza got specific consent to use the device.
Mrs. Packard also testified by deposition. She recalled the discussion before the fusion surgery and stated that Dr. Razza explained that he would not know | fiwhat needed to be done until the actual surgery. She denied that Dr. Razza discussed the fact that he was going to put hardware into her back to promote the fusion. Her testimony is that she was never given the choice not to have the device implanted into her back during the first surgery in 1991. In 1993 she was told that the device may be removed if the fusion was complete. Although by the second surgery Mrs. Packard knew the screws were implanted, she did not know they were not approved by the FDA; as such, she did not insist they be removed at that time. However, she confirmed that she has never been told that the hardware was improperly placed.
Subsequent to the 1993 surgery, Mrs. Packard learned the pedicle screws were not approved by the FDA and could break off in her back. She moved to Colorado and in 1995 consulted Dr. David Baron because of back pain. Dr. Baron suggested a steroid block, but Mrs. Packard opted not have that procedure. She had no procedures again until 1999 when she elected to have the plate and screws removed from her back. At the time of surgery, she was given the option of getting a morphine implant or removing the metal plates. She decided to have the device removed at the same time she had surgery to repair a torn rotator cuff.
Mrs. Packard contracted an infection as a result of that surgery that persisted for two years and required two further surgeries as well as extended hospital stays. It caused depression and impaired her lifestyle considerably. She stated that she filed suit in Colorado,- as well as this suit against Dr. Razza. She confirmed that she is also part of a class action against the manufacturers of the pedicle screw.
Mrs. Packard testified that she has never been told that the use of the pedicle screws is a breach of the standard of care. However, she maintains that she would not have had them implanted had she been aware that they were not approved by the FDA.
|7Pr. Wheaton Williams, an expert in infectious disease medicine, testified that he treated Mrs. Packard in Colorado in March of 2001. He was called in to treat her in the emergency room of the Park-view Hospital in Pueblo Colorado. Mrs. Packard had undergone surgery on March 16, 2001 and was suffering from a post operative lumbar wound, infection. According to Dr. Williams’ testimony, Mrs. Packard had been suffering from back pain for years. However, he stated that the infection arose following the removal of hardware from her back in March of 1999. In his deposition, Dr. Williams stated that “she gave a history of, in essence, chronic recurring infection over that two-year period of time.” Dr. Williams opined that Mrs. Packard had a “vertebral osteomyeli-tis”, or bone. infection over the two years following the March, 1999 surgery to remove the spinal hardware. Although Dr. Williams said that the risk of infection increases with the use of an implant, he stated he was not qualified to offer an opinion of the standard of care for an orthopedic surgeon.
It is undisputed that Mrs. Packard signed the consent forms, and that the printed forms used did not disclose that *533 the pedicle screws used to fuse her spine were not yet approved by the FDA. Whether Dr. Razza verbally informed Mrs. Packard of that fact in the conference about the surgery options and risks is disputed. The issue before us is whether that fact is a “material fact” precluding summary judgment..
A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La.C.C.P. 966(B). Appellate courts review summary judgment de novo using the same criteria applied by the district court in order to determine whether the grant of summary judgment was | ^appropriate. Gautreaux v. Dufrene, 04-970 (La.App. 5 Cir. 1/11/05), 894 So.2d 385, 387. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of actions. La.C.C.P. 966(A)(2).
Decisions as to the propriety of granting the motion must be made with reference to the substantive law applicable to the case. Mohsan v. Roule-Graham, 05-122 (La.App. 5 Cir. 6/28/05), 907 So.2d 804. Facts are material when their existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 751.
Our consideration of the law on informed consent to medical procedures begins with La. R.S. 40:1299.40. That statute provides in pertinent part;
A (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was' induced by misrepresentation of material facts.
B Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
Additionally, in a lack of informed consent case, the plaintiff must also prove that there was a causal relationship between the doctor’s failure and the damages claimed by the patient. Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447, citing LaCaze v. Collier, 434 So.2d 1039 (La.1983), concurring opinion, 437 So.2d 869 (La.1983). Otherwise, the doctor’s conduct, however wrongful, is legally inconsequential. Id. As explained in Lugenbuhl, 701 So.2d at 454;
There are two aspects to the proof of causation in a lack of informed consent case. First, the plaintiff must prove, as in any other tort action, that the defendant’s breach of duty was a cause-in-fact *534 of the claimed damages or, viewed conversely, that the defendant’s proper performance of his or her duty would have prevented the damages. Second, the plaintiff must further prove that a reasonable patient in the plaintiffs position would not have consented to the treatment or procedure, had the material information and risks been disclosed.
(citations omitted)
In the matter before us, the written, signed consent forms are explicit in that the Luque plates and pedicle screws will be used, and the risks of that procedure are set forth in the form. Further, the injury sustained by Mrs. Packard did not result from the implantation of the device.
Mrs. Packard developed an infection six years later when she elected to have the device removed during an unrelated surgery. The doctor who performed the surgery was not the defendant. Further, the surgery was elective. There is no indication that the device failed in any way, or that the implantation of the device is a breach of the standard of care. Therefore, we find the only fact at issue, whether Mrs. Packard was informed that the device used to stabilize her back was not yet approved by the FDA, is not a material fact sufficient to preclude the grant of a summary judgment in favor of Dr. Razza.
The judgment of the trial court is affirmed.
AFFIRMED.

. 97-C-900 (La.App. 5 Cir. 9/30/97).

. 97-CC-2723 (La. 1/30/98), 709 So.2d 688.