Judgment rendered July 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,480-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

GARY NORDGREN                                          Plaintiff-Appellant

versus

STATE OF LOUISIANA, THROUGH                    Defendants-Appellees
THE BOARD OF SUPERVISORS OF
THE LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE
THROUGH LOUISIANA STATE
UNIVERSITY HEALTH SCIENCES
CENTER-SHREVEPORT, AND TODD
DARREN JAEBLON, D.O.,
AND JOSEPH MARC BONVILLAIN,
M.D.

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 598061

Honorable Craig Owen Marcotte, Judge

* * * * *

PETER DENIS JOSEPH DERBES                      Counsel for Appellant

JEFFREY M. LANDRY                                      Counsel for Appellees
Attorney General

AMANDA D. BROTHERTON-TODD
AMBER MANDINA BABIN
Assistant Attorneys General

* * * * *

Before PITMAN, GARRETT, McCALLUM, JJ.

**McCALLUM, J.**

Gary Nordgren alleges that an orthopedic surgeon at LSU Health Sciences Center-Shreveport ("hospital") harvested bone from his right knee without his consent during surgery to repair a fracture in his upper right arm. Two of the three physicians on a Medical Review Panel concluded that the surgeon breached the standard of care for informed consent. However, the panel physicians agreed that any damage that resulted from this autograft procedure was not a factor of the breach itself but was a factor of the infection, a known complication of any surgical procedure. Nordgren subsequently filed this lawsuit against the surgeon, his surgical resident, and the State of Louisiana through the LSU Board of Supervisors through the hospital (collectively referred to as "LSU"). Compensation for pain and suffering, disability, mental anguish, and emotional distress were among the damages sought by Nordgren.

Nordgren filed a motion for partial summary judgment on the issue of LSU's liability for mental anguish damages. LSU then filed a motion for summary judgment seeking dismissal of Nordgren's action. The trial court found there was "accurate informed consent" and granted LSU's motion for summary judgment. Nordgren now appeals the judgment dismissing his lawsuit. Concluding that genuine issues of material fact remain regarding an alleged misrepresentation, breach of the duty to disclose, and causation, we reverse the judgment of dismissal and remand.

## BACKGROUND

In November of 2012, Nordgren, who was an inmate at Avoyelles Correctional Center, fractured his right humerus while performing triceps

dips. Nordgren had sustained a gunshot wound in that area of his arm seven years earlier.

A gravity cast was initially placed on the broken arm. However, when the fracture did not completely heal, a different type of cast was substituted. Nevertheless, the fracture remained unhealed.

On April 9, 2013, Nordgren was examined at the hospital by Dr. Todd Jaeblon, an orthopedic surgeon. Dr. Jaeblon was assisted by Dr. Joseph Bonvillain, an orthopedic surgery resident. Dr. Jaeblon described Nordgren's fracture as accompanied by pre-existing deformities and scar tissue. He told Nordgren that they could continue with the nonsurgical course of treatment or he could attempt to heal the fracture surgically. Nordgren opted to proceed with surgery, which would include the possibility of an autograft procedure. An autograft involves the harvesting of bone from the patient's own body while the patient is under general anesthesia.

An informed consent form signed by Nordgren on April 9 described the treatment as "open versus closed reduction using internal versus external fixation of right humerus fracture; possible use of bone autograft, allograft, or other bone substitute." The form stated that the treatment side was the right. As was customary for him, Dr. Jaeblon did not review the consent form before it was given to Nordgren. Dr. Bonvillain, the surgery resident, went over the consent form with Nordgren.

By signing the consent form, Nordgren agreed that the doctors could perform more procedures if he needed them. Nordgren also agreed that he had asked all questions that he had about the treatment, the risks, and the other choices, and that he chose to proceed with the treatment and procedure.

The hospital's informed consent policy stated that its purpose was to: (i) familiarize the hospital's staff with the requirements for obtaining consent; (ii) assure compliance with state law and the requirements of accrediting agencies; (iii) protect the patient's right to give informed consent; and (iv) ensure patients are adequately informed prior to giving consent. The policy further stated that a specific consent should include the "[s]pecific site, including left or right when appropriate[.]" Although the consent form signed by Nordgren listed the arm surgery location, it did not list any specific autograft site.

There is a dispute concerning what information about the potential autograft site was conveyed by Dr. Jaeblon to Nordgren on April 9. Nordgren contends that Dr. Jaeblon told him that bone would be harvested from his hip. Dr. Jaeblon testified at his deposition that he does not use the word "hip" and he could not recall telling Nordgren that his hip would or could be used for the graft. Dr. Jaeblon also testified that he does not indicate to his patients the location of the autograft in detail, but will tell them that he will borrow bone from a part of the body where they are less likely to need it. When Dr. Jaeblon was asked if he remembered what he told Nordgren about possible donor sites, he said it was pretty much the same thing that he tells his other patients, which is that he will harvest bone from one of several sites. He added that he will give examples of sites if the patient asks questions, but it is rare that a patient will ask exactly which bone will be the donor site. Dr. Jaeblon remembered that Nordgren had very few questions, but he could not recall what those questions were.

Nordgren was admitted to the hospital on April 29 for the surgery. His right upper and lower extremities, along with his left hip, were prepped

3

prior to surgery. Dr. Jaeblon's operative report states the arm surgery was complex. Bone was harvested from Nordgren's intramedullary right femur after an incision was made at the mid patellar tendon. Nordgren asserts that he first noticed his right knee had been operated on when he was brought to the surgery recovery room. Nordgren was discharged from the hospital on April 30.

Nordgren testified in his deposition that he reported severe pain in his right knee to Dr. Jaeblon following surgery. He also testified that when he asked Dr. Jaeblon why he operated on his right knee, the surgeon sidestepped his question and he never received a response.

On May 14, 2013, Nordgren complained to doctors of right knee pain since the surgery. He was given a prescription for antibiotics, which he first took on May 16. Nordgren was admitted to the hospital on May 17 because of right knee pain and swelling. The diagnosis was prepatellar infected bursitis. Nordgren remained in the hospital for about nine days receiving treatment for the infection.

Nordgren filed a request for a Medical Review Panel ("MRP") on April 25, 2014. The MRP decided 2-1 that the evidence supported the conclusion that Dr. Jaeblon and Dr. Bonvillain failed to meet the applicable standard of care. In the MRP's written reasons for conclusion, Dr. Ellis Cooper and Dr. Marion Milstead explained they found a breach of the standard of care because the hospital's policy required informing Nordgren of the specific site of the procedure. Dr. Dan Oas disagreed that there had been a breach.

Dr. Oas explained in the MRP's reasons for conclusion that he has performed similar surgeries when multiple donor areas for an autograft

4

could have been needed, and that just as Dr. Jaeblon had done, he discussed the potential multiple harvest sites in detail. Dr. Oas opined that a consent form which listed autograft harvest when multiple harvest sites were considered did not breach the standard of care as long as the sites were discussed with the patient in detail. Dr. Oas thought Dr. Jaeblon testified that he explained the multiple potential harvest sites to Nordgren.

Regarding causation, the MRP agreed that any damage that resulted from the breach was not a factor of the breach itself but was a factor of the infection, which is a known complication of any surgical procedure. The MRP also agreed that there was no impairment or disability resulting from the breach itself. Finally, the MRP recognized there was an issue of material fact regarding the dispute over whether or not Dr. Jaeblon told Nordgren that the graft would come from his hip.

In January of 2017, Nordgren filed this lawsuit asserting a lack of informed consent. Nordgren contended that Dr. Jaeblon told him that if a bone graft was needed, it would be taken from his hip, and on the basis of that information, he consented to the surgery. Nordgren further contended that his knee was never mentioned as a possible harvest site, and the consent form violated hospital policy because it did not list the potential harvest sites. Nordgren maintained that he did not give informed consent to his knee being the site of the autograft; therefore, he did not knowingly accept the risk of a knee infection. Nordgren alleged that he has experienced extreme pain and loss of function in his right knee because of the infection.

### Summary judgment

Nordgren filed a motion for partial summary judgment regarding his entitlement to "dignitary" or mental anguish damages that were allegedly

sustained at the moment that Dr. Jaeblon invaded his knee. In support of his motion, Norgren submitted: (i) the MRP opinion and written reasons for conclusion; (ii) excerpts from his own deposition as well as from the depositions of Dr. Jaeblon and Dr. Bonvillain; (iii) the consent form and the hospital's informed consent policy; (iv) excerpts from his medical records; and (v) Dr. Jaeblon's supplemental answer to an interrogatory.

LSU argued in opposition to the motion that Nordgren's consent is presumed to be valid and effective under La. R.S. 40:1157.1(A) in the absence of proof that his consent was induced by misrepresentation of material facts. LSU maintained there is no requirement under law that a specific harvest location be mentioned on the form, and the hospital's informed consent policy cannot expand the statutory requirements for informed consent. LSU contended that Nordgren could not establish that the alleged breach of duty was a cause-in-fact of his damages, or that a reasonable patient in his position would have refrained from consenting to the knee being used as the harvest location.

Submitted by LSU in opposition to Nordgren's motion for partial summary judgment were: (i) excerpts from the depositions of Nordgren and Dr. Jaeblon; (ii) excerpts from Nordgren's hospital records; (iii) the consent form and the hospital's informed consent policy; (iv) the MRP opinion and written reasons for conclusion; and (v) the results of a knee x-ray done on July 22, 2013.

LSU subsequently filed its own motion for summary judgment on March 20, 2019. LSU argued that summary judgment was proper because Nordgren had not rebutted the presumption that his written consent was

6

valid and effective, and he could not meet his burden of proving a lack of informed consent or causation.

In support of the motion, LSU principally submitted the same documents that it had submitted in opposition to Nordgren's earlier motion. New documents submitted by LSU included Dr. Oas's affidavit, an additional page from Nordgren's deposition, and an additional medical record from Nordgren's hospitalization for the knee infection.

Opposing LSU's motion, Nordgren contended there is a disputed issue of material fact concerning the misrepresentation about the hip, there was no indication of a medical exigency requiring Dr. Jaeblon to take bone from the knee instead of the hip, and he agreed to the surgery because he thought his hip would be the donor site. Nordgren further contended that because the specific donor location is part of the nature of the procedure, the consent form failed to set forth the nature of the procedure as required by law. Nordgren also attacked Dr. Oas's affidavit as being premised on Dr. Jaeblon telling Nordgren in detail about multiple potential donor sites, which was not what Dr. Jaeblon actually did. Finally, Nordgren pointed out that LSU erroneously characterized his case as a "material risk" case. He argued that the rational patient standard for causation in material risk cases did not apply to his claim.

In opposition to the motion, Nordgren submitted the same documents that he submitted earlier in support of his own summary judgment motion, along with Dr. Jaeblon's original interrogatory answer, the petition, and an excerpt from Nordgren's prison medical records.

Finding there was "accurate informed consent," the trial court granted LSU's motion for summary judgment and dismissed Nordgren's lawsuit.

7

Although the trial court did not directly rule on Nordgren's motion for partial summary judgment, it is assumed that it was denied. Nordgren has appealed.

## DISCUSSION

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880.

A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1).

The law on informed consent is set forth in La. R.S. 40:1157.1, which states, in part:

8

A. Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1163.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such consent.

C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A of this Section, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Subsection A of this Section, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

D. In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

E. Consent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of R.S.

40:1157.2 as another method by which to evidence a patient's consent to medical treatment.

La. R.S. 40:1157.1 was redesignated from La. R.S. 40:1299.39.5 in 2015.

A plaintiff in an action based on the failure to obtain informed consent is required to prove the following four elements in order to prevail: (1) a material risk existed that was unknown to the patient; (2) the physician failed to disclose the risk; (3) the disclosure of the risk would have led a reasonable patient in the patient's position to reject the medical procedure or choose another course of treatment; and (4) the patient suffered injury. *See Snider v. Louisiana Medical Mut. Ins. Co.*, 13-0579 (La. 12/10/13), 130 So. 3d 922.

However, two distinct categories of lack of informed consent cases have been recognized. In the more common "material risk" cases, a doctor fails to inform the patient of a material risk of the procedure performed. In the less common "no-consent" cases, a doctor fails to notify the patient of the type or the parameters of the procedure to be performed. In "no-consent" cases, the patient may also suffer damages to his dignity, privacy, and emotional well-being. *See Lugenbuhl v. Dowling*, 96-1575 (La. 10/10/97), 701 So. 2d 447. Nordgren contends his claim is a no-consent case because he never consented to his knee being used as the harvest site.

As noted by the Louisiana Supreme Court in *Lugenbuhl*, liability for the failure to obtain informed consent was originally premised on the concept of battery. However, later informed consent cases based liability upon a breach of the doctor's duty to disclose material information when obtaining consent. The *Lugenbuhl* court "reject[ed] battery-based liability in lack of informed consent cases (which include no-consent cases) in favor of

10

liability based on breach of the doctor's duty to provide the patient with material information concerning the medical procedure." *Id.*, 96-1575 at p. 9, 701 So. 2d at 453.

Of course, the inquiry in an informed consent case does not end with the question of duty and breach. There must also be a causal relationship between the doctor's failure to disclose material information and material risk of damage to the patient. *LaCaze v. Collier*, 434 So. 2d 1039 (La. 1983).

There are two aspects to the proof of causation in a lack of informed consent case. First, the plaintiff must prove, as in any other tort action, that the defendant's breach of duty was a cause-in-fact of the claimed damages. Second, the plaintiff must further prove that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure, had the material information and risks been disclosed. *Lugenbuhl*, *supra*. However, the latter standard does not always apply in a no-consent case.

As noted in *Lugenbuhl*, the typical reasonable patient standard for causation is not applicable in a no-consent case concerning the plaintiff's entitlement to damages for deprivation of self-determination, insult to personal integrity, invasion of privacy, anxiety, worry, and mental distress.[1] *See Nestor v. Louisiana State Univ. Health Sciences Ctr. In Shreveport*, 40,378 (La. App. 2 Cir. 12/30/05), 917 So. 2d 1273, *writ denied*, 06-0221 (La. 4/24/06), 926 So. 2d 551.

---

[1] In *Lugenbuhl*, the reasonable patient causation test would have applied to the plaintiff's claim that his doctor's failure to use mesh in his hernia repair caused his later herniation.

11

*Misrepresentation*

La. R.S. 40:1157.1(A) states that "consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts." Nordgren testified in his deposition that Dr. Jaeblon told him that if they needed to do a bone graft, it would be taken from his hip. He further stated that Dr. Jaeblon never talked about the possibility of the graft coming from any other location on his body.

Dr. Jaeblon did not recall this conversation. He even stated that he does not use the word "hip" when describing that bone. In his original interrogatory answer, Dr. Jaeblon denied that specific sites for the graft were discussed.

When Dr. Bonvillain was asked what the most common donor sites are, he mentioned the iliac crest, which is part of the hip. Interestingly, the surgery report stated that Nordgren's left hip and leg circumferentially to his toes were prepped. His right upper extremity and right lower extremity were prepped as well. An autograft procedure is done under general anesthesia, so Nordgren would have been in no position to protest when Dr. Jaeblon began cutting into his knee.

A genuine issue of material fact surrounds whether Dr. Jaeblon misrepresented to Nordgren that his hip would be the harvest site. If Nordgren can establish this fact at trial, he will defeat the statutory presumption that his consent was valid and effective.

*Breach of duty*

Two of the three physicians on the MRP concluded there was a breach of the standard of care because the hospital's policy required informing

Nordgren of the specific site of the procedure. LSU contends that the statute requires only that the form set forth the nature and purpose of the procedure in general terms, and the hospital cannot expand the statutory requirements.

In support of its argument, LSU cites *Siliezar v. East Jefferson General Hosp.*, 04-939 (La. App. 5 Cir. 1/11/05), 894 So. 2d 373. The court in *Siliezar* rejected the claim that verbal consent to hand surgery was not valid because clinic policy required written consent prior to surgery. The court noted that the informed consent statute permitted verbal consent assuming it met the established criteria. *Siliezar* can be easily distinguished as there is a significant difference between the manner in which consent is given as compared to what is disclosed to the patient before consent is obtained. Moreover, before and during the procedure, the patient in *Siliezar* was aware of the location on her body for the procedure.

Dr. Oas, who is board-certified in orthopedic surgery, opined that there was no breach of the standard of care regarding informed consent. When he has performed surgeries like the one in question and there were multiple potential harvest areas, he discussed the potential harvest sites in detail with the patient. In general, he did not list all of those potential sites on the consent form unless he knew exactly which bone would be harvested. In summary, he did not believe the standard of care is breached when the exact donor site is not listed on the consent form when multiple potential sites are a possibility. He thought the consent form in question described in detail the procedure to be performed.

Underpinning Dr. Oas's opinion is that he discusses the multiple donor sites in detail with his patients before obtaining their consent. Dr. Jaeblon apparently failed to do that in this matter since Nordgren did not ask

13

him for examples of harvest sites. According to Dr. Jaeblon, he told Nordgren the same thing that he tells all his patients, which is he will harvest bone from one or several sites. No more information was forthcoming from Dr. Jaeblon, who recalled that Nordgren had very few questions.

For his part, Dr. Bonvillain had no specific recollection of what Dr. Jaeblon told Nordgren. He recalled only that Dr. Jaeblon explained the nature of the surgery and the risks, benefits, and alternatives, and then he reviewed those with Nordgren.

Dr. Bonvillain testified that when he provided information to patients before their surgery, he did not note the possible location of the bone donor sites on the written consent form. He explained that including the possible locations on the form would take multiple pages. We note that while the consent form did not list any possible harvest sites, it did list the exact site of the arm surgery, the right humerus, which was information already known by Nordgren.

Finally, when Nordgren signed the consent form, he gave consent for Dr. Jaeblon to perform other necessary procedures. However, those would be in the nature of unexpected necessary procedures. Harvesting bone from the knee was not an unexpected procedure.

In conclusion, a genuine issue of material fact remains concerning whether Dr. Jaeblon breached his duty to provide Nordgren with material information regarding the autograft procedure.

*Causation*

If Nordgren can establish a breach of duty at trial, he will then have to prove that the breach was the cause-in-fact of his "dignitary" or mental anguish damages. However, those are not the only damages that he seeks to

14

recover.  He is also seeking damages related to his infection, and he is required to meet the higher "reasonable patient" standard in order to recover those damages.

Nordgren testified that he was an avid runner and would not have agreed to surgery involving his knee for that reason.  He claimed he only agreed to the surgery because he believed that his hip would be the donor location for the autograft.  According to Dr. Oas, the hip joint and knee joint are both utilized in running, hiking, standing, skiing, and other related athletic activities, and the hip joint and knee joint are both susceptible to bursitis.  However, there is no indication the hip joint was going to be the actual donor location on the hip itself.

Nordgren testified that he would jog up to eight miles a day before the surgery, but now he cannot walk a mile without stopping to rest.  He claimed his participation in the prison's exercise program has been affected.  He also claimed that his knee was unstable, and a large knot on it prevented him from kneeling.

Nordgren reported during an examination on May 23, 2013, that his knee pain was slowly decreasing, and there was no numbness or tingling in his knee.  The assessment at the time was right knee prepatellar bursitis/cellulitis.  A medical record from the next month showed that his knee pain was getting progressively better and the wound had healed. Nordgren reported that his knee pain increased the more that he walked or was active.  Minimal tenderness was noted over the patella, and he had a good range of motion.  An x-ray of the knee on July 22, 2013, showed that the bones were well mineralized, and there was no fracture or dislocation.

15

Nordgren begged for the arm surgery because his fracture had not healed through nonsurgical methods and his arm had been rendered essentially useless. Surgery was the only way that the fracture would heal. The surgery involved stabilizing the humerus and stimulating healing in an area which was prone to poor healing because of its prior condition and injuries. Dr. Jaeblon described Nordgren's medical situation as being an unconventional one.

Nordgren declined the option of continuing with nonsurgical treatment. The arm surgery clearly offered great promise to him. Nevertheless, begging for arm surgery is not tantamount to consent for bone being harvested from the knee. If Nordgren was not informed that his knee was a potential donor site, he was deprived of the opportunity to fully consider whether the benefits outweighed the drawbacks. He would also have been deprived of the opportunity to seek another medical opinion.

A genuine issue of material fact remains concerning whether a reasonable patient in Nordgren's position would not have consented to the arm surgery had it been disclosed to him that the knee was a potential donor site for the autograft.

**CONCLUSION**

In summary, genuine issues of material fact remain concerning the alleged misrepresentation that would overcome the presumption of a valid and effective consent, the alleged breach, and alleged causation. Accordingly, the trial court erred in granting LSU's motion for summary judgment. However, the implicit denial of Nordgren's motion for partial summary judgment was proper. With each party to bear its own appeal

16

costs, we REVERSE the judgment of dismissal and REMAND this matter to the trial court for further proceedings consistent with this opinion.